Argued and submitted March 12, 2020; decision of Court of Appeals reversed, judgment of circuit court affirmed March 4, 2021

STATE OF OREGON,
*Petitioner on Review,*

*v.*

JUSTIN ALAN LINK,
*Respondent on Review.*

(CC 01FE0371AB) (CA A163518) (SC S066824)

482 P3d 28

Defendant moved for an order declaring that the 2001 sentencing scheme applicable to his conviction for aggravated murder violates Article I, section 16, of the Oregon Constitution and the Eighth Amendment to the United States Constitution, as construed by the United States Supreme Court in *Miller v. Alabama*, 567 US 460, 132 S Ct 2455, 183 L Ed 2d 407 (2012). The trial court denied that motion, and sentenced defendant to "life imprisonment" with a minimum of 30 years without the possibility of parole pursuant to ORS 163.105(1)(c) (2001). The Court of Appeals reversed, concluding that defendant had abandoned his argument under Article I, section 16, but that the sentencing scheme violated the Eighth Amendment. *Held*: (1) Defendant failed to raise his Article I, section 16, argument before the Court of Appeals and prudential reasons did not weigh in favor of considering it on review; (2) the prohibition announced in *Miller* applies to mandatory sentences of life without parole (or the functional equivalent) for juvenile offenders; and (3) a sentence of "life imprisonment" under ORS 163.105(1)(c) (2001), which affords juvenile offenders who have served a minimum of 30 years the opportunity to convert their sentence to one with the possibility of parole, is not the equivalent of a life-without-parole sentence and is not unconstitutional.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

En Banc

On review from the Court of Appeals.*

Benjamin Gutman, Solicitor General, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ellen F. Rosenblum, Attorney General.

Marc D. Brown, Chief Deputy Defender, Office of Public Defense Services, Salem, argued the cause and filed the

_____

* On appeal from Deschutes County Circuit Court, Alta Jean Brady, Judge. 297 Or App 126, 441 P3d 664 (2019).

brief for respondent on review. Also on the brief was Ernest G. Lannet, Chief Defender.

Andy Simrin, Andy Simrin PC, Portland, filed the brief for *amicus curiae* Seth Edwin Koch.

Sara Kobak, Schwabe, Williamson & Wyatt, P.C., Portland, filed the brief for *amici curiae* American Civil Liberties Union of Oregon, American Civil Liberties Union Foundation, and Youth, Rights & Justice. Also on the brief were Kelly Simon, American Civil Liberties Union of Oregon, Steven M. Watt, American Civil Liberties Union Foundation, and Angela Sherbo and Christa Obold Eshleman, Youth, Rights & Justice.

Crystal Maloney, Brooklyn, New York, filed the brief for *amici curiae* Oregon Justice Resource Center and Oregon Criminal Defense Lawyers Association.

GARRETT, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

**GARRETT, J.**

Defendant committed aggravated murder as a juvenile in 2001. He was sentenced to a term of life imprisonment, which, as defined by statute at the relevant time, requires him to serve "a minimum of 30 years without possibility of parole." ORS 163.105(1)(c) (2001). After serving that minimum term of confinement, defendant can petition to convert his sentence to life imprisonment with the possibility of parole. ORS 163.105(2), (3) (2001). In this case, defendant argues that the statute under which he was sentenced violates the Eighth Amendment to the United States Constitution. The Court of Appeals agreed. *State v. Link*, 297 Or App 126, 128, 441 P3d 664 (2019) (*Link IV*). We allowed the state's petition for review. For the reasons that follow, we reverse the decision of the Court of Appeals and affirm the judgment of the circuit court.

## I.   AGGRAVATED MURDER SENTENCING SCHEME

We begin with a brief overview of the 2001 scheme under which defendant was sentenced.

### A.   *Initial Sentencing*

In 2001, aggravated murder was defined as murder "which is committed under, or accompanied by," certain aggravating circumstances. ORS 163.095 (2001).[1] A juvenile charged with committing aggravated murder at the age of 15, 16, or 17 was automatically prosecuted in adult criminal court. ORS 137.707(1)(a) (2001);[2] *see also* ORS 419C.005(1) (2001) (noting that ORS 137.707 sets forth an exception to the juvenile court's "exclusive original jurisdiction" over "any case involving a person who is under 18 years of age and who has committed an act which is a violation, or which if done by an adult would constitute a violation, of a law or ordinance").[3]

---

[1] ORS 163.095 (2001), *amended by* Or Laws 2005, ch 264, § 17; Or Laws 2012, ch 54, § 26; Or Laws 2015, ch 614, § 149; Or Laws 2019, ch 635, § 1.

[2] ORS 137.707 (2001), *amended by* Or Laws 2007, ch 867, § 6; Or Laws 2011, ch 334, § 2; Or Laws 2019, ch 634, § 5.

[3] ORS 419C.005 (2001), *amended by* Or Laws 2003, ch 396, § 98; Or Laws 2005, ch 843, § 7; Or Laws 2019, ch 634, § 14.

For a defendant convicted of aggravated murder, ORS 163.105(1)(a) (2001)[4] provided three possible sentences: (1) death; (2) "life imprisonment without the possibility of release or parole"; or (3) "life imprisonment." However, ORS 137.707(2) (2001) prohibited juveniles from being sentenced to death.

Thus, a juvenile convicted of aggravated murder could be sentenced to "life imprisonment without the possibility of release or parole" or "life imprisonment." The choice between those sentences was made following a sentencing proceeding pursuant to ORS 163.150(1)(a), (3)(a)(B) (2001),[5] which provided that "evidence may be presented as to any matter that the court deems relevant to [the] sentence including, but not limited to, *** any aggravating or mitigating evidence ***."

Depending on whether the defendant waived his or her jury right, either the court or the jury would determine whether there were sufficient mitigating circumstances to warrant a sentence of "life imprisonment" under ORS 163.105(1)(c) (2001), instead of "life imprisonment without the possibility of release or parole." ORS 163.150(3)(a)(B), (3)(b) (2001). If the court or jury determined that sufficient mitigating circumstances existed, then the court would sentence the defendant to life imprisonment. ORS 163.150 (3)(b) (2001). The statutory scheme further provided that, for such a sentence, "the defendant shall be confined for a minimum of 30 years without possibility of parole, release to post-prison supervision, release on work release or any form of temporary leave or employment at a forest or work camp." ORS 163.105(1)(c) (2001). After that minimum period of confinement, the Board of Parole and Post-Prison Supervision (board), upon defendant's petition, holds a "murder-review" hearing to determine whether the defendant is "likely to be rehabilitated within a reasonable period of time." ORS 163.105(2) (2001). Upon such determination, the board is required to convert defendant's sentence to "life imprisonment with the possibility of parole." ORS 163.105(3) (2001).

---

[4] ORS 163.105 (2001), *amended by* Or Laws 2007, ch 717, § 1; Or Laws 2009, ch 660, § 6; Or Laws 2015, ch 820, § 45; Or Laws 2019, ch 634, § 27.

[5] ORS 163.150 (2001), *amended by* Or Laws 2005, ch 480, § 1; Or Laws 2017, ch 359, § 4; Or Laws 2019, ch 635, § 5.

Thus, in 2001, a juvenile who committed aggravated murder at the age of 15, 16, or 17 years old would automatically be tried in adult criminal court but, unlike an adult, could be sentenced only to "life imprisonment without the possibility of release or parole" or "life imprisonment." A defendant who received the latter sentence would have to serve at least 30 years before being entitled to a murder-review hearing at which the board would determine whether the sentence should be converted to life with the possibility of parole.

B.  *Conversion of Sentence*

Because some of defendant's arguments on review concern the nature of the murder-review hearing process, we next discuss that process in some detail, keeping our focus on the statutes and rules that apply to a crime committed in 2001. At a murder-review hearing, the board determines whether the prisoner's sentence shall be converted to "life imprisonment *with* the possibility of parole, release to post-prison supervision or work release." ORS 163.105(3) (2001) (emphasis added). That conversion determination depends on whether the prisoner establishes that he "is likely to be rehabilitated within a reasonable period of time." ORS 163.105(2) (2001). By rule, the board has articulated the following criteria relevant to that determination:

"(1)   The inmate's involvement in correctional treatment, medical care, educational, vocational or other training in the institution which will substantially enhance his/her capacity to lead a law-abiding life when released;

"(2)   The inmate's institutional employment history;

"(3)   The inmate's institutional disciplinary conduct;

"(4)   The inmate's maturity, stability, demonstrated responsibility, and any apparent development in the inmate personality which may promote or hinder conformity to law;

"(5)   The inmate's past use of narcotics or other dangerous drugs, or past habitual and excessive use of alcoholic liquor;

"(6)   The inmate's prior criminal history, including the nature and circumstances of previous offenses;

"(7)   The inmate's conduct during any previous period of probation or parole;

"(8) The inmate does/does not have a mental or emotional disturbance, deficiency, condition or disorder predisposing them to the commission of a crime to a degree rendering them a danger to the health and safety of the community;

"(9) The adequacy of the inmate's parole plan including community support from family, friends, treatment providers, and others in the community; type of residence, neighborhood or community in which the inmate plans to live;

"(10) There is a reasonable probability that the inmate will remain in the community without violating the law, and there is substantial likelihood that the inmate will conform to the conditions of parole."

OAR 255-032-0020 (2001). If the board agrees by unanimous vote "that the prisoner is capable of rehabilitation and that the terms of the prisoner's confinement should be changed to life imprisonment with the possibility of parole," the board "shall" enter an order converting the sentence. ORS 163.105(3) (2001). Otherwise, if the board denies the petition, "not less than two years after the denial \*\*\*, the prisoner may petition again for a change in the terms of confinement." ORS 163.105(4) (2001).

The murder-review hearing is conducted "in the manner prescribed for a contested case hearing under ORS 183.310 to 183.550," except that the prisoner has "the burden of proving by a preponderance of the evidence the likelihood of rehabilitation with a reasonable period of time," and the prisoner has the right to counsel, including, if necessary, counsel appointed at the board's expense. ORS 163.105 (2)(a)-(b) (2001). In addition, the prisoner has the right to have the board subpoena witnesses if he shows the "general relevance and reasonable scope of the evidence being sought." OAR 255-032-0029(1).[6]

---

[6] Several of the board's rules applicable to murder-review hearings were promulgated after defendant committed the crimes, but before he was sentenced. Particularly, as relevant here, OAR 255-032-0027, OAR 255-032-0029, OAR 255-032-0030, and OAR 255-032-0031 were all promulgated after defendant committed aggravated murder, but before he was sentenced. However, defendant does not argue that those administrative rules do not apply to his murder-review hearing. Accordingly, we assume that they do and rely on them in this opinion.

Additional procedural protections are set out in, *inter alia*, OAR 255-032-0030 (allowing prisoner to submit evidence, object to evidence, and cross-examine witnesses), OAR 255-032-0027 (requiring board to provide disclosure of exhibits to be used at hearing), and OAR 255-032-0031 (requiring board to produce written final order following hearing, which, if adverse to prisoner, must include findings of fact and conclusions of law).

In the event that defendant's sentence is converted to life with the possibility of parole, the parties have not addressed in detail what would happen next; that question is affected by statutes and administrative rules that have changed in part since the 2001 date of the crime in this case. However, in its briefing and at oral argument, the state has taken the position that, either at the murder-review hearing or "shortly thereafter" at a "parole hearing," the board will determine defendant's "sentence term" pursuant to the "matrix system." *See* ORS 144.120 (2001) (explaining parole hearing);[7] ORS 144.780 (2001) (setting forth matrix system). The state further represents that, under the matrix system, defendant's presumptive sentence term could be as low as 120 months or as high as 288 months to life; the board also could depart from the applicable presumptive sentence if it determines that aggravating or mitigating circumstances justify such departure. *See* ORS 144.785 (2001) (explaining board's authority to depart from presumptive sentence under matrix system).

Furthermore, according to the state, the board would set defendant's release date based on the sentence term and the date of the crime. In other words, the sentence term would "start" on the date of the crime and "end" when the sentence term expires. *See, e.g.*, *Janowski/Fleming v. Board of Parole*, 349 Or 432, 456, 245 P3d 1270 (2010) (explaining that the petitioner's presumptive sentence under the matrix system had already expired). Thus, the board can theoretically set a prison term that makes a prisoner immediately available for parole.

Once the release date is set, the defendant is entitled to be released on that date unless the board finds, at

---

[7] ORS 144.120 (2001), *amended by* Or Laws 2010, ch 89, § 11.

an exit-interview hearing, "that the prisoner engaged in serious misconduct during confinement" and postpones the release date. *See* ORS 144.125(2) (2001) (providing for exit interview); ORS 144.245(1) (2001) (providing that if a prisoner does not have an unexpired minimum term, the prisoner "shall be released" on the release date).[8] The board also may postpone the release date if the board finds that the defendant has "a present severe emotional disturbance such as to constitute a danger to the health or safety of the community." *See* ORS 144.125(3)(a) (2001). Additionally, the board may defer the defendant's release "for not more than three months if it finds that the [defendant's] parole plan is inadequate." *See* ORS 144.125(4) (2001).

In sum, at the murder-review hearing, the board will determine whether defendant is "likely to be rehabilitated within a reasonable period of time." If so, the board is required to convert defendant's sentence to life with the possibility of parole. According to the state, at that point or "shortly thereafter," the board will establish defendant's sentence term pursuant to the matrix system and set defendant's release date. Defendant then is entitled to release on that date unless the board determines that one of three statutory reasons justifies postponing release. However, according to the state, defendant will be able to seek review of the board's subsequent decisions.

## II.   FACTS

Defendant was charged in 2001 with numerous crimes after he and a group of friends stole a car and sought to conceal that act by murdering the car's owner. He was convicted of multiple felonies, including aggravated murder under ORS 163.095(2)(e) (2001) (describing a murder "committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime") (Count 4). Those convictions led to two direct appeal proceedings involving assignments of error that are not pertinent to the issue now on review. *State v. Link*, 214 Or App 100, 162 P3d 1038 (2007) (*Link I*), *rev'd in part, aff'd in part and rem'd*, 346 Or 187, 208 P3d 936 (2009); *State v. Link*, 346 Or 187, 208

---

[8] ORS 144.125 (2001), *amended by* Or Laws 2009, ch 660, § 3.

P3d 936 (2009) (*Link II*); *State v. Link*, 260 Or App 211, 317 P3d 298 (2013) (*Link III*).

In the second direct appeal proceeding, the Court of Appeals remanded the case for resentencing. *Link III*, 260 Or App at 217. On remand, defendant moved for an order declaring the aggravated-murder sentencing scheme unconstitutional. Specifically, defendant argued that the sentencing scheme violated Article I, section 16, of the Oregon Constitution and the Eighth Amendment to the United States Constitution, as construed by the United States Supreme Court in *Miller v. Alabama*, 567 US 460, 132 S Ct 2455, 183 L Ed 2d 407 (2012) (holding that the Eighth Amendment prohibits a mandatory sentence of life without parole for juveniles who commit homicide offenses).

The trial court rejected defendant's argument that the statutory scheme is categorically unconstitutional and denied the motion. The court then explained that, pursuant to a written stipulation between the parties, to comply with *Miller* and *Montgomery v. Louisiana*, 577 US 190, 136 S Ct 718, 193 L Ed 2d 599 (2016), the court would conduct an "evidentiary hearing to determine as a matter of law, whether [d]efendant is ineligible for a sentence of life without the possibility of parole." The state would "bear the burden of proof to show by a preponderance of the evidence that [d]efendant is eligible for a true[-]life sentence."

At the evidentiary hearing, the trial court heard testimony from fact witnesses regarding defendant's actions surrounding the murder; from family members who described defendant's early childhood and adolescent years; and from state corrections employees who described defendant's conduct during his years of incarceration. In addition, the court heard from three expert witnesses: (1) Dr. Bonnie Nagel, a neuropsychologist; (2) Dr. James Garbarino, a developmental psychologist; and (3) Dr. Alexander Duncan, a clinical and forensic psychologist.

After the hearing, the trial court concluded that the evidence was insufficient to show that defendant "is the rare juvenile offender whose crime reflects irreparable corruption or irretrievable depravity so extensive that rehabilitation is impossible." The court cited United States Supreme Court

decisions recognizing a "juvenile's diminished culpability and heightened capacity for change," and noted "the progression of science in the area of adolescent development," as evidenced by the testimony of the three expert witnesses.[9]

The court then made several findings regarding defendant's involvement in and actions after the murder, his childhood,[10] and his actions immediately after being arrested for murder.[11] The trial court also made favorable findings as to defendant's conduct after being transferred to Eastern Oregon Correctional Institution (EOCI), in September 2003.[12]

Turning to the expert witness testimony, the trial court found that Dr. Duncan had concluded that defendant "likely had the onset of conduct disorder around age 13," but that he "does not have an antisocial personality disorder, nor has [d]efendant exhibited any signs of antisocial behavior in the past 13 years." Dr. Duncan also concluded

---

[9] Specifically, Dr. Nagel described how the development of the limbic system and the prefrontal regulatory system during adolescence; stress and exposure to neglect, abuse, and violence; and the presence of peers are "related to teenagers engaging in risky decision making and activities." Dr. Garbarino testified that adolescents with trauma history tend to exemplify "the worst of adolescent behaviors." However, most adolescents are "capable of repair."

[10] The court found that, from an early age, defendant was subject to "shocking neglect and abuse." Although defendant was "passive and submissive" in the face of that abuse, he was "defiant and aggressive in school and community." The court further found that defendant's "negative behavior outside the home escalated." By the time that he was 15, defendant was moved to an "alternative education program." But his aggressive behaviors continued to "escalate[]," so he was not allowed to continue to attend the program. After that, defendant "was charged with menacing and disorderly conduct" and placed in juvenile court school. By age 17, defendant "encouraged and participated" in the murder underlying this case.

[11] The court found that defendant "continued to exhibit antisocial behavior in the Deschutes County Jail" and received 51 disciplinary actions over the course of two years. However, at the time of trial, defendant's last recorded misconduct was in June 2003.

[12] The court found that defendant has "completely avoided involvement at any level with gangs"; completed all available programs and classes; worked successfully in multiple job positions; and "is trusted by EOCI staff to respond to EOCI's plumbing needs unsupervised." "Defendant is involved in the inmate hospice program, a position requiring presence and compassion." He also "mentors and is a role model for other inmates." And he "demonstrated an altruistic side when he organized a fundraiser for a family in need." Finally, the court found that defendant has never had a positive random urinalysis result. And, because defendant has exhibited prolonged periods of clean conduct, he resides in one of four extended housing units.

that defendant had not "displayed any features of an adult personality disorder." Finally, Dr. Duncan concluded that defendant's "risk for recidivism and violence is low for both the short and long term."

Similarly, Dr. Garbarino concluded that it was evident that defendant "was psychologically maltreated as a child" and that he likely experienced Type 2 trauma, which "involves chronic, repeated traumatic experiences." However, Dr. Garbarino opined that defendant's "prosocial tendencies exhibited during incarceration suggest [d]efendant was not irreparably damaged as a result of abuse during childhood and adolescence."

The court then explained that there was "extensive evidence from which to conclude that [d]efendant's juvenile conduct disorder has not developed into an antisocial personality disorder. The 180 degree change in [d]efendant's behavior is consistent with the expected timing of the physical development of the regulatory prefrontal cortex." Thus, although defendant's conduct prior to his arrival at EOCI "was horrendous and is unforgivable," that conduct "was a reflection of unfortunate yet transitory immaturity." Accordingly, the trial court determined that defendant could not be sentenced to life without the possibility of parole.

At a subsequent sentencing hearing, the trial court sentenced defendant to life imprisonment with a minimum of 30 years without the possibility of parole pursuant to ORS 163.105(1)(c) (2001). Defendant renewed his objection to that sentence, contending that the sentencing scheme is unconstitutional "in that it imposes [a] *de facto* true[-]life term."

Defendant appealed a third time, reiterating his argument that his sentence of "life imprisonment" under ORS 163.105(1)(c) (2001) violates the Eighth Amendment as interpreted in *Miller* because the sentence is, in fact, a mandatory sentence of life without parole when imposed.

As discussed in more detail below, 367 Or at 651-52, a divided panel of the Court of Appeals agreed that ORS 163.105 (2001) violates *Miller*. The majority interpreted the Supreme Court's Eighth Amendment case law on juvenile

sentencing, culminating in *Miller*, as prohibiting a sentencing court from imposing "the state's most severe penalties on a juvenile offender without regard for the unique qualities of youth that might make imposition of that sentence inappropriate," and concluded that a sentence of life imprisonment is such a sentence. *Link IV*, 297 Or App at 157-88. The Court of Appeals further noted that defendant had "abandoned" his reliance on Article I, section 16, of the Oregon Constitution and it did not address the constitutionality of defendant's sentence under that provision. *Id.* at 131, 132 n 2.

The state petitioned for review, which we allowed.

## III.    DISCUSSION

### A.    *Arguments under Article I, Section 16, of the Oregon Constitution*

We allowed review to consider the state's argument that the Court of Appeals reached the wrong conclusion under the Eighth Amendment. On review, however, defendant renews a contention that he made at the trial court, but that he did not raise at the Court of Appeals, which is that his sentence also violates Article I, section 16, of the Oregon Constitution. As noted above, the Court of Appeals determined that defendant had abandoned the latter argument on appeal. *Link IV*, 297 Or App at 131, 132 n 2. The state contends that defendant's state constitutional argument is thus not properly before us. For his part, defendant argues that he did not actually abandon his state constitutional argument on appeal; in the alternative, defendant argues that, regardless of whether he did, this court should still address the argument in light of our preference for resolving questions under the state constitution before turning to federal constitutional issues. Thus, before turning to the Eighth Amendment issues, we first consider whether to address the merits of defendant's Article I, section 16, argument. For the reasons that follow, we decline to do so.[13]

---

[13] In a similar vein, *amicus curiae* Seth Edwin Koch (*amicus* Koch) also makes an argument that is unrelated to the Eighth Amendment: that Oregon's sentencing scheme violates the Due Process Clause of the Fourteenth Amendment, as interpreted in *Sandstrom v. Montana*, 442 US 510, 99 S Ct 2450, 61 L Ed

Article I, section 16, of the Oregon Constitution states that "[c]ruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense." Defendant argued to the trial court that Article I, section 16, prohibits his sentence of "life imprisonment" under ORS 163.105(1)(c) (2001). He makes the same argument here.[14] However, defendant did not expressly pursue any argument under the state constitution at the Court of Appeals. He nonetheless argues that, because the state constitutional provision "closely parallels the Eighth Amendment," the Court of Appeals should have understood defendant's arguments as drawing "on constitutional proportionality limitations under both sources."

As this court has explained, adjudication "resolves legal and factual issues *framed by litigants*." *State v. McDonnell*, 329 Or 375, 389, 987 P2d 486 (1999) (emphasis added). Consistent with that idea of adjudication, courts "embrace[] the preservation requirement," *Peeples v. Lampert*, 345 Or 209, 220, 191 P3d 637 (2008), and, accordingly, "generally confine their judgments to the issues that the litigants have raised and submitted for decision," *McDonnell*, 329 Or at 390. *See also* ORAP 5.45(4)(a) ("Each assignment of error must demonstrate that the question or issue presented by the assignment of error timely and properly was raised and preserved in the lower court."); ORAP 9.20(2) ("If review is not so limited, the questions before the Supreme Court include all questions properly before the Court of Appeals ***."). To that end, this court generally only considers an issue if it is first "presented to the trial court," *Peeples*, 345 Or at 219, and the issue is "briefed or

---

2d 39 (1979), because ORS 163.150(2) to (3) (2017) "impermissibly shift[s] to the defendant the burden of proof on a factual issue that increases the quantum of punishment to which a defendant is exposed." The issue on which this court granted review, however, is whether sentencing a juvenile to "life imprisonment" under ORS 163.105(1)(c) (2001) violates the Eighth Amendment. Accordingly, we decline to address the Fourteenth Amendment issue. *See Harris v. Suniga*, 344 Or 301, 313, 180 P3d 12 (2008) (declining to address arguments advanced by the *amici* because they went beyond the scope of the issue on which review was allowed).

[14] *Amici curiae* American Civil Liberties Union of Oregon, American Civil Liberties Union Foundation, and Youth, Rights & Justice (*amici* ACLU), along with *amici curiae* Oregon Justice Resource Center and Oregon Criminal Defense Lawyers Association, join defendant in that argument.

argued on appeal," *see Stanfield v. Laccoarce*, 284 Or 651, 659, 588 P2d 1271 (1978).[15]

   Just as an issue that was not preserved at the trial court ordinarily is not amenable to consideration by the Court of Appeals, issues that were not raised in a party's brief to the Court of Appeals ordinarily will not be considered by this court. *State v. Lacey*, 364 Or 171, 180 n 4, 431 P3d 400 (2018), *cert den*, ___ US ___, 139 S Ct 1590 (2019) (declining to address state constitutional argument, in part, because issue was not raised in the Court of Appeals); *State v. Hamilton*, 348 Or 371, 376 n 4, 233 P3d 432 (2010) (noting that the issue was not properly before this court, in part, because defendant did not raise it in the Court of Appeals). This court, in particular, adheres to the preservation requirement not only to ensure that parties have had fair opportunities to raise and respond to arguments at earlier stages of litigation, but because this court's process of resolving legal issues benefits from the consideration given to those issues by the Court of Appeals in its own opinions. *See, e.g., State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988) (explaining that it is "important to efficient judicial procedures that the positions of the parties be clearly presented to the initial tribunal and on appeal").

   Preservation is a pragmatic doctrine, and defendant is correct that, in some cases, this court has considered the fact "that certain parallel provisions of the state and federal constitutions are identical in meaning" when determining whether an issue was preserved at trial. *State v. Walker*, 350 Or 540, 551, 258 P3d 1228 (2011). As such, we have rejected a "hard-and-fast rule" that a litigant always must articulate distinct arguments under the state and federal constitutions, explaining instead that the "appropriate focus" is

> "whether a party has given opponents and the trial court enough information to be able to understand the contention and to fairly respond to it. The necessity of fleshing out a contention with more developed or detailed analysis will

---

[15] "The principal exception to preservation requirements is for so-called 'plain error'—that is, an error apparent on the record, about which there is no reasonable dispute." *Peeples*, 345 Or at 219.

depend on the circumstances and the nature of the issue
that has been raised."

*Id.* at 551-52. In other words, when parallel constitutional
provisions are at issue, a party is not necessarily required to
develop separate and distinct arguments under both consti-
tutions in the trial court to preserve both issues for review
on appeal. However, a party still must frame its argument in
a way that gives notice to the trial court and opponents that
it is advancing its claim under both constitutional sources.

In his brief at the Court of Appeals, defendant raised
two assignments of error: (1) "The trial court erred in impos-
ing a life sentence on defendant, a juvenile offender," and
(2) "The trial court erred in imposing a 30-year mandatory
minimum sentence on defendant, a juvenile." Defendant's
arguments in support of those assignments of error make
clear that the sole source of authority on which he drew was
the Eighth Amendment.

First, the brief includes numerous statements that
the sentencing scheme "violates the Eighth Amendment to
the United States Constitution," but it includes no compara-
ble assertion that the sentencing scheme violates Article I,
section 16 (or the state constitution generally).

Second, defendant's appellate brief said nothing to
assert or imply that the Eighth Amendment and Article I,
section 16, impose substantively identical prohibitions such
that the legal arguments that defendant advanced under
the former should also bear on the latter. He did not cite
case law for any proposition as to Article I, section 16.
Throughout the argument section of his brief, defendant
mentioned Article I, section 16, only once, to observe that
that provision is nearly identical to the cruel-and-unusual-
punishment provision in Iowa's constitution.[16] But, that sin-
gle reference was part of defendant's argument that *State v.
Lyle*, 854 NW2d 378 (Iowa 2014), is instructive regarding the

---

[16] Defendant also referenced Article I, section 16, in the preservation section.
One of those references was a general reference, explaining that defendant raised
an Article I, section 16, claim at trial. The other two references were within a
long block quote of the trial court transcript. In context, those two references,
also, were insufficient to alert the Court of Appeals and the state that defendant
was pursuing an argument under Article I, section 16.

contours of the *Eighth Amendment*, despite being decided under the Iowa Constitution. And, in noting that similarity, defendant did not explain why that similarity mattered for purposes of Article I, section 16. Thus, in context, that single reference to Article I, section 16, did not put the state or the Court of Appeals on notice that defendant was asserting an argument under the state constitution.

The state observed in its responsive brief at the Court of Appeals that defendant did "not contend that the sentence of life imprisonment with a 30-year minimum term violates Article I, section 16, of the Oregon Constitution, either on its face or as applied to him." Defendant did not file a reply brief contesting that point. At oral argument, the state reiterated its understanding that defendant was not making an argument under Article I, section 16. Again, defendant did not contest that point. In light of the foregoing, we agree with the Court of Appeals that defendant did not raise an Article I, section 16, argument in that court.

Defendant next argues that this court should address his Article I, section 16, argument regardless of preservation concerns. Defendant argues that, in *State v. Kennedy*, 295 Or 260, 266-67, 666 P2d 1316 (1983), this court articulated a "preference" for considering "whether a statute violates the state constitution before embarking on similar, but potentially unnecessary, analysis under the federal constitution." *See also Sterling v. Cupp*, 290 Or 611, 614, 652 P2d 123 (1981) (articulating the "first things first" doctrine); *State v. Clark*, 291 Or 231, 233 n 1, 630 P2d 810, *cert den*, 454 US 1084 (1981) (explaining that even if defendant abandoned his state constitutional argument, the rationale underlying the "first things first" doctrine weighed in favor of considering such argument).

It is true that this court has frequently stated a preference for resolving disputes under state law, including the state constitution, if possible. On the other hand, it is a bedrock principle of appellate jurisprudence that courts generally should decide cases as framed by the parties' properly raised and preserved arguments. The interplay between the "first things first" doctrine and jurisprudential principles such as preservation is a difficult and important

issue that has not received systematic treatment by this court.[17] Nevertheless, despite what was said in *Sterling* and *Clark*, the trend in this court's case law in recent decades has been decidedly against reaching unpreserved arguments under state law. *See State v. Selness/Miller*, 334 Or 515, 523-24, 540, 542, 54 P3d 1025 (2002) (concluding that the defendants had waived an as-applied challenge under the state constitution before concluding that the defendants' state facial challenge, as well as their federal double jeopardy challenges, failed); *Stelts v. State of Oregon*, 299 Or 252, 258, 701 P2d 1047 (1985) (declining to address the state constitutional argument before addressing federal constitutional argument because no developed argument under the state constitution was presented); *State v. Farber*, 295 Or 199, 207 n 10, 666 P2d 821, *cert den*, 464 US 987 (1983) (noting that the court would not consider the state constitutional issue before considering the federal constitutional issue because the state constitutional issue was not briefed); Jack L. Landau, *Of Lessons Learned and Lessons Nearly Lost: The Linde Legacy and Oregon's Constitutional Law*, 43 Willamette L Rev 251, 260 (2007) (discussing this court's practice of proceeding to federal constitutional law questions without first determining whether state constitutional law is dispositive).

We do not rule out the possibility that, in a future case, this court may find prudential reasons to address an unpreserved question of state law in addition to, or in lieu of, a federal question. But the procedural history of this case counsels against doing that here. Defendant raised a state constitutional claim at the trial court and then, for unknown reasons, did not do so at the Court of Appeals. The state specifically noted in its response brief and during oral argument at that court that defendant was not raising a state constitutional claim. Defendant had repeated opportunities to refute the state's position if he believed it was incorrect, and he declined to do so. Under those circumstances,

---

[17] *State v. Mitchell*, 273 Or App 207, 215 n 3, 360 P3d 525 (2015) (describing the "unresolved conflict" in this court's cases regarding the relative priority to be given the "first things first" doctrine and preservation principles); *State v. Rodriguez-Moreno*, 273 Or App 627, 633 n 6, 359 P3d 532 (2015), *rev den*, 358 Or 611 (2016) (noting the unresolved conflict); *State v. Velykoretskykh*, 268 Or App 706, 707 n 2, 343 P3d 272 (2015) (same).

we do not see a prudential justification for allowing defendant to revive his state constitutional claim now. Moreover, defendant identifies none, other than his invocation of the "first things first" doctrine—which, in our recent case law, has not been enough to lead us to reach unpreserved claims. Accordingly, we decide as a prudential matter not to address the merits of the Article I, section 16, argument, and we proceed to defendant's argument under the Eighth Amendment.

B.  *Eighth Amendment*

This case implicates four United States Supreme Court decisions addressing the requirements that the Eighth Amendment imposes on the sentencing of juveniles. We begin with an overview of those four cases and this court's decisions applying them. We then turn to the Court of Appeals decision below. *Link IV*, 297 Or App 126. Finally, we address defendant's arguments on review.[18]

1.  *Eighth Amendment and categorical sentencing limitations for juveniles*

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[19] The Supreme Court

---

[18] In addition, *amici* ACLU make an argument that is distinct from both defendant's arguments and the Court of Appeals' rationale. Particularly, *amici* ACLU argue that the Eighth Amendment categorically bars a sentence of "life imprisonment" under ORS 163.105(1)(c) (2001). *Amici* ACLU's argument, however, differs from defendant's argument, that is, *amici* ACLU do not argue that the sentence at issue here is categorically barred because it is the functional equivalent to the sentence at issue in *Miller*. Rather, *amici* ACLU reason that the objective indicia of society's standards and the factors the Supreme Court considers in exercising its independent judgment, establishes that the Eighth Amendment categorically bars the sentence at issue here. In other words, *amici* ACLU advance an argument for a new categorical rule, separate from the one established in *Miller*.

However, the issue on which we granted review, as framed by the trial court and Court of Appeals briefing, is whether a sentence of "life imprisonment" under ORS 163.105(1)(c) (2001) falls within the categorical rule announced in *Miller*, either because it is among the "most severe" sentences or because it is the functional equivalent to life without the possibility of parole. Accordingly, *amici* ACLU's argument "go[es] beyond what is at issue here"; we therefore decline to address it. *See Harris*, 344 Or at 313 (declining to address arguments advanced by the *amici* that went beyond the scope of the issue).

[19] "The provision is applicable to the States through the Fourteenth Amendment." *Roper v. Simmons*, 543 US 551, 560, 125 S Ct 1183, 161 L Ed 2d 1 (2005).

has construed the prohibition of cruel and unusual punishment as requiring that the punishment for a crime "be graduated and proportioned to both the offender and the offense." *Miller*, 567 US at 469 (quotation marks omitted).

Eighth Amendment proportionality cases fall into two general classifications: (1) "challenges to the length of term-of-years sentences given all the circumstances in a particular case" and (2) "categorical rules to define Eighth Amendment standards." *Graham v. Florida*, 560 US 48, 59-60, 130 S Ct 2011, 176 L Ed 2d 825 (2010). "The [second] classification in turn consists of two subsets, one considering the nature of the offense, the other considering the characteristics of the offender." *Id.* at 60. But in each of those subsets, the Court has generally taken the following approach:

> "The Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice,' to determine whether there is a national consensus against the sentencing practice at issue. Next, guided by 'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning and purpose,' the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution."

*Id.* at 61 (citations omitted). In that second part of the analysis, the Court considers "the culpability of the offenders at issue in light of their crimes and characteristics," "the severity of the punishment in question," and "whether the challenged sentencing practice serves legitimate penological goals." *Id.* at 67. Based on those considerations, the Court determines whether the particular sentence is disproportionate for the offense or offender. *Id.*

In this case, defendant does not invoke the first category of proportionality challenge—that is, he does not argue that a sentence of at least 30 years in prison before any possibility of parole arises is substantively unconstitutional for a person who committed a crime like defendant committed. Instead, he makes the second type of proportionality challenge: he contends that the Eighth Amendment

categorically prohibits the type of sentencing scheme at issue here. Specifically, he contends that ORS 163.105 (2001) is categorically unconstitutional because the statutory scheme fails adequately to account for juvenile offenders' age and age-related characteristics, as required by the United States Supreme Court's decisions in *Roper v. Simmons*, 543 US 551, 125 S Ct 1183, 161 L Ed 2d 1 (2005), *Graham*, *Miller*, and *Montgomery*, which all dealt with sentencing of juveniles. We turn to those cases.

First, in *Roper*, the Court held that the Eighth Amendment categorically prohibits the death penalty for juvenile offenders. 543 US at 575. The Court explained that, "[b]ecause the death penalty is *the most severe* punishment, the Eighth Amendment applies to it with special force." *Id.* at 568 (emphasis added). Specifically, the Eighth Amendment limits the death penalty "to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Id.* (quoting *Atkins v. Virginia*, 536 US 304, 319, 122 S Ct 2242, 153 L Ed 2d 335 (2002)). The Court then explained that juveniles have "diminished culpability" because they typically possess three characteristics that distinguish them from adults: (1) juveniles have a "lack of maturity and an undeveloped sense of responsibility," resulting in "impetuous and ill-considered actions and decisions"; (2) "juveniles are more vulnerable or susceptible to negative influences and outside pressures"; and (3) the "personality traits of juveniles are more transitory, less fixed." *Id.* at 569-71. For those reasons, the Court explained, "the penological justifications for the death penalty apply to [juveniles] with lesser force than to adults." *Id.* at 571. Accordingly, the Court concluded that "the death penalty is [a] disproportionate punishment for offenders under 18." *Id.* at 575.

Shortly thereafter, in *Graham*, the Supreme Court held that the Eighth Amendment prohibits a sentence of life without parole (or "true life") for a juvenile who commits a nonhomicide offense. 560 US at 82. The Court began by noting that "*Roper* established that because juveniles have lessened culpability they are less deserving of the most severe punishments." *Id.* at 68. It then said that "defendants who do not kill, intend to kill, or foresee that life will be taken

are categorically less deserving of the most serious forms of punishment than are murderers." *Id.* at 69. From those premises, the Court concluded that, "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has twice diminished moral culpability." *Id.*

The Court then noted that "life without parole is 'the second most severe penalty permitted by law.'" *Id.* (quoting *Harmelin v. Michigan*, 501 US 957, 1001, 111 S Ct 2680, 115 L Ed 2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment)). Key to the Court's reasoning in *Graham* was its observation that, although the death penalty is "'unique in its severity and irrevocability,' *** life without parole sentences *share* some characteristics with death sentences that are shared by *no* other sentences." *Id.* (quoting *Gregg v. Georgia*, 428 US 153, 187, 96 S Ct 2909, 49 L Ed 2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) (emphases added)). Like the death penalty, a sentence of life without parole "alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence." *Id.* at 69-70.

Finally, the Court reasoned that the penological theories behind punishment (retribution, deterrence, incapacitation, and rehabilitation) are "not adequate to justify life without parole for juvenile nonhomicide offenders." *Id.* at 74. That determination, along with "the limited culpability of juvenile nonhomicide offenders[] *and* the severity of life without parole sentences," led the Court to conclude that life without parole for nonhomicide juvenile offenders is cruel and unusual. *Id.* (emphasis added).

Having held in *Graham* that the Eighth Amendment categorically bars true-life sentences for juveniles who commit nonhomicide offenses, the Court took up the question of homicide offenses several years later, in *Miller*, and concluded that the Eighth Amendment prohibits *mandatory* true-life sentences for such offenders. 567 US at 479. That conclusion, the Court explained, rested on the "confluence" of two lines of precedent: (1) the Court's cases establishing

categorical bans on certain sentencing practices for juvenile offenders—*Roper* and *Graham*—and (2) the Court's cases "demanding individualized sentencing when imposing the death penalty." *Id.* at 470-77. The Court explained that the latter line of cases was relevant because of "*Graham*'s [t]reat[ment] [of] juvenile life sentences *as analogous* to capital punishment." *Id.* at 475 (quoting *Graham*, 560 US at 89 (Roberts, C.J., concurring) (brackets in *Miller*; emphasis added)).

The Court took from *Roper* and *Graham* the principle that, because an offender's juvenile status is relevant to the Eighth Amendment proportionality requirement, the "imposition of a State's *most severe* penalties on juvenile offenders cannot proceed as though they were not children." *Id.* at 474 (emphasis added). And, from the death penalty cases, the Court took the "requirement that capital defendants have an opportunity to advance, and the judge or jury a chance to assess, any mitigating factors, so that the death penalty is reserved only for the most culpable defendants committing the most serious offenses." *Id.* at 475-76. Together, those two lines of precedent established a "principle of proportionality": "that youth matters for purposes of meting out the law's most serious punishments[;]" thus, a "judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at 483, 489. It followed, the Court held, "that the Eighth Amendment forbids a sentencing scheme that *mandates* life in prison without the possibility of parole for juvenile offenders." *Id.* at 479 (emphasis added). Rather, the Eighth Amendment requires individualized decision-making in which the sentencer considers "an offender's youth and attendant characteristics." *Id.* at 483. If the sentencer determines that the juvenile's crime reflects the "transient immaturity of youth," then life without parole cannot be imposed. *Id.* at 479-80 (quotation marks omitted). That sentence is permissible only for the "rare juvenile offender whose crime reflects irreparable corruption." *Id.* (quotation marks omitted).[20]

---

[20] For ease of reference, we refer to that inquiry as "*Miller*'s individualized-sentencing requirement."

Finally, in *Montgomery*, the Court held that *Miller* had announced a substantive rule of constitutional law that applied retroactively:

> "Because *Miller* determined that sentencing a child to life without parole is excessive for all but 'the rare juvenile offender whose crime reflects irreparable corruption,' it rendered life without parole an unconstitutional penalty for 'a class of defendants because of their status'—that is, juvenile offenders whose crimes reflect the transient immaturity of youth. As a result, *Miller* announced a substantive rule of constitutional law. Like other substantive rules, *Miller* is retroactive ***."

577 US at 208 (citations omitted).

The Court then considered how to give *Miller* retroactive effect. The Court explained that a state can remedy a *Miller* violation "by permitting juvenile homicide offenders to be considered for parole." *Id.* at 212. The Court explained that "[a]llowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Id.*

In sum, the Court has held that the Eighth Amendment (1) categorically prohibits the death penalty for juvenile offenders, *Roper*, 543 US at 575; (2) categorically prohibits life-without-parole sentences for juveniles who commit nonhomicide offenses, *Graham*, 560 US at 82; and (3) for juveniles who commit homicide offenses, prohibits sentencing schemes that *mandate* life-without-parole sentences without affording the opportunity to consider an offender's "youth and attendant characteristics," *Montgomery*, 577 US at 209-10. Accordingly, a sentencing scheme that mandates life without parole for a juvenile offender will fail *Miller*'s individualized-sentencing requirement. *Id.* To remedy a past *Miller* violation, a state can permit a juvenile homicide offender to be considered for parole. 577 US at 212. "Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured— will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Id.*

2.   *This court's interpretation of* Miller*'s breadth*

Since *Miller* and *Montgomery*, this court has twice confronted the issue of which sentences, if any, other than mandatory life-without-parole are subject to *Miller*'s individualized-sentencing requirement. First, in *Kinkel v. Persson*, 363 Or 1, 3-4, 417 P3d 401 (2018), *cert den*, ___ US ___, 139 S Ct 789 (2019), this court considered whether *Miller* prohibited "an aggregate sentence of slightly less than 112 years" for a petitioner who, at the age of 15, committed four counts of murder and 26 counts of attempted murder. The petitioner argued that *Miller* barred such an aggregate sentence because it was "the functional equivalent of a life sentence without the possibility of parole." *Id.* at 3. He contended that "the number and nature of his offenses should not be a factor in striking an Eighth Amendment proportionality balance." *Id.* at 19. We understood his argument to be that "when a juvenile's aggregate sentence is equivalent to life without possibility of parole, then the severity of the sentence coupled with the characteristics of juvenile offenders will always lead to the conclusion that a life sentence without possibility of parole will violate the Eighth Amendment." *Id.*

We rejected that argument, explaining that the "holdings in *Miller* and *Graham* do not compel the categorical rule that [the] petitioner urge[d]":

"The question in *Miller* was whether a juvenile who had committed a single homicide could be sentenced to life imprisonment without the possibility of parole for that crime. *Graham* is similarly limited. In that case, the question was whether a juvenile convicted of a single nonhomicide offense could be sentenced to life without parole. The Court neither considered nor decided in *Miller* and *Graham* how the categorical limitations that it announced for a single sentence for one conviction would apply to an aggregate sentence for multiple convictions.

"It follows that the holdings in *Miller* and *Graham* do not dictate the result when a juvenile is convicted of multiple murders and attempted murders, as [the] petitioner was."

*Id.* at 19-20 (footnotes and citation omitted). We then concluded that the "reasoning in *Graham* and *Miller* permits

consideration of the nature and the number of a juvenile's crimes in addition to the length of the sentence that the juvenile received and the general characteristics of juveniles in determining whether a juvenile's aggregate sentence is constitutionally disproportionate." *Id.* at 21. Accordingly, we concluded that consideration of the number and nature of the petitioner's crimes was appropriate when determining whether the petitioner "comes within the class of juveniles who, as *Miller* recognized, may be sentenced to life without possibility of parole for a homicide."[21] *Id.* at 24.

In *White v. Premo*, 365 Or 1, 12-15, 443 P3d 597 (2019), *cert dismissed sub nom Kelly v. White*, ___ US ___, 140 S Ct 993 (2020), this court held that *Miller*'s individualized-sentencing requirement applies to a term-of-years sentence that is the "functional equivalent" of life without parole. There, the petitioner had been sentenced to a determinate sentence of 800 months for one murder conviction. *Id.* at 12. In post-conviction proceedings, the petitioner argued that, "although that sentence was not explicitly a sentence to life without parole, it is a sentence that exceeds his life expectancy and is the functional equivalent of such a sentence and subject to the protections of *Miller*." *Id.* The superintendent responded by first arguing that, because the "petitioner was sentenced to a term of years and not to life, *Miller* does not apply." *Id.* And, "even if some determinate sentences may be subject to *Miller*, [the] petitioner's sentence [was] not so long as to make it certain that he will die in prison." *Id.* In support of that later position, the superintendent noted that the petitioner was "eligible for good-time credit and possibly other forms of relief that could reduce his nearly 67-year sentence to 54 years." *Id.*

---

[21] In doing so, we struck a balance between two approaches other jurisdictions have taken when facing the same question: (1) the approach that considers the number and nature of a juvenile's crimes as "immaterial when an aggregate sentence approximates life without the possibility of parole," and (2) the approach that finds "the existence of an aggregate sentence a sufficient basis, in and of itself, for distinguishing *Miller* and *Graham*." *Kinkel*, 363 Or at 22.

However, even though we held that consideration of the number and nature of the petitioner's crimes was permissible, we did note that "[i]t might be possible to uphold [the] petitioner's sentence against an Eighth Amendment challenge based solely on the number and magnitude of his crimes." *Id.* at 24.

We rejected the superintendent's first argument, noting that most courts that have addressed the limits of *Miller* "have understood the inquiry to focus, not on the label attached to a sentence, but on whether its imposition would violate the principles that the Court sought to effectuate." *Id.* at 12-13. And, because we saw no penological justification for treating a sentence that was the "functional equivalent of life" differently, we concluded that *Miller* applied to such a sentence. *Id.* at 13.

We then turned to the question of whether the petitioner's sentence was, in fact, "functionally equivalent to a life sentence." *Id.* at 14. Assuming without deciding that good-time credit was a proper consideration when determining the contours of the petitioner's sentence, we noted that, even accounting for good-time credit, the petitioner would still be required to "serve at least 54 years and [would] be released, at the earliest, when he is 68 years old." *Id.* at 15. We then concluded that "a sentence in excess of 50 years" was "sufficiently lengthy" to require a *Miller* individualized-sentencing analysis. *Id.* However, we emphasized that we had not been presented in that case with a developed argument that "a sentence in excess of 50 years would leave a particular juvenile offender *with* a meaningful opportunity for release" and, thus, was not the functional equivalent of life without parole. *Id.* (emphasis added). Therefore, we noted that our holding did not "foreclose" such a future argument. *Id.*

In sum, this court has held that *Miller* does not foreclose consideration of the number and nature of a juvenile's crimes when considering whether an aggregate sentence of slightly less than 112 years is constitutionally disproportionate. *Kinkel*, 363 Or at 20. And this court has concluded that *Miller*'s individualized-sentencing requirement applies to sentences for single homicide offenses that are "functionally equivalent" to life without parole. *White*, 365 Or at 13-15.

3. *Application*

Here, defendant was sentenced to "life imprisonment" under ORS 163.105(1)(c) (2001). As noted earlier in this opinion, that sentence is statutorily distinct from a sentence of life imprisonment without the possibility of parole and

carries with it the possibility, after a minimum prison term, of conversion to a sentence of life with the possibility of parole. Thus, defendant did not receive a life-without-parole sentence, nor does he contend that his minimum prison term of 30 years is the "functional equivalent" of that sentence. In short, defendant's sentence does not fall squarely within the categories of sentences that have been held by the Supreme Court or this court to implicate the Eighth Amendment. For that reason, the state's position on review is that the *Miller* individualized-sentencing requirement simply has no application to defendant's sentence and the Eighth Amendment analysis ends there. The Court of Appeals, however, concluded that the sentencing scheme applicable to defendant violated *Miller. Link IV*, 297 Or App at 128. That court discerned a principle in *Miller* that extends beyond the particular types of sentences considered to date by the Supreme Court and prohibits the imposition of any sentence that is among a state's "most severe penalties" without individualized sentencing procedures. *Id.* at 134-36.

Defendant takes a different tack. On review, defendant argues that the sentence he received was, in fact, a mandatory life-without-parole sentence despite being labeled otherwise; thus, in his view, his sentence violates *Miller* under a straightforward application of that case. Before turning to defendant's argument, we address the Court of Appeals' rationale.

a.   The Court of Appeals' interpretation of *Miller* in *Link IV*

The issue on review turns on what the Supreme Court meant in *Miller* when it said that individualized sentencing is required before a state's "most severe penalties" are imposed on juveniles. The Court of Appeals majority reasoned that, when the *Miller* Court discussed *Graham*'s and *Roper*'s "foundational principle" that juveniles must be treated differently in sentencing, the Court did not "explicitly" limit that principle to "death, or life without parole" sentences. *Link IV*, 297 Or App at 134 (quotation marks omitted). Rather, it was grounded "within the broader category of 'a State's most severe penalties.'" *Id.* (quoting *Miller*, 567 US at 474). Thus, according to the Court of Appeals

majority, "the threshold question in considering whether the principles of *Roper*, *Graham*, and *Miller* apply at juvenile sentencing is this: Does the case involve the imposition of the state's *most severe penalties* against a juvenile defendant?" *Id.* at 136 (emphasis in *Link IV*). "And, when the sentence is among the most severe, the secondary question becomes whether the statutory sentencing scheme for a juvenile offender fulfills the constitutional duty to fully consider youth in sentencing." *Id.* at 136-37.

The majority then applied that analytical framework, first concluding that a sentence of "life imprisonment" under ORS 163.105(1)(c) (2001) is among the "most severe" sentences in Oregon law. *Id.* at 147-48. The majority then considered whether imposition of a sentence under ORS 163.105 (2001) complied with *Miller*'s individualized-sentencing requirement and concluded that it did not. *Id.* at 148-58. The majority first reasoned that, under the sentencing scheme, "there is no consideration by the sentencing court of the qualities of youth that might render the imposition of *any* of the three sentences prescribed by ORS 163.105 [(2001)] inapplicable." *Id.* at 149 (emphasis added). And, the murder-review hearing, explained the majority, was not an adequate mechanism for consideration of the qualities of youth for three reasons: (1) the murder-review hearing does not comport with *Graham*'s and *Miller*'s holding that "the proper actor to consider the qualities of youth is the *sentencer*"; (2) even if the board could be considered a sentencer for purposes of *Miller*, the board's consideration comes 30 years after the imposition of the sentence, undercutting *Miller*'s reasoning that the "act of subjecting the juvenile to the sentence without the consideration of the qualities of youth" violates the constitution; and (3) even if the murder-review hearing could suffice, the statutes and administrative rules governing the hearing do not "consider youth as something that diminishes the moral culpability and blameworthiness of the defendant." *Id.* at 149-54 (emphasis in original).

In a dissenting opinion, Judge Tookey wrote that *Miller* and *Montgomery* apply to a sentence of "life without parole under a mandatory sentencing scheme that precludes

the defendant from 'present[ing] mitigation evidence to justify a less severe sentence.'" *Id.* at 167 (Tookey, J., dissenting) (quoting *Montgomery*, 577 US at 194 (brackets in *Link IV*)). To determine if that threshold is met, "the nature of the sentencing practice at issue, and the penological justifications for the sentence being imposed, must be evaluated to determine if the sentence is analogous to those that have been deemed the 'most severe' by the Supreme Court." *Id.* at 169. And, the dissent concluded, "life imprisonment" under ORS 163.105(1)(c) (2001) is not analogous to the death penalty or life without parole—the sentences that have been deemed the "most severe" by the Supreme Court. *Id.* at 170-76.

On review, the state argues that the Court of Appeals majority incorrectly applied *Miller*. According to the state, the context of *Miller*, *Roper*, and *Graham* make clear that, when the Court in *Miller* referred to the "most severe" or "harshest penalties," it meant the death penalty and true-life sentences. Thus, the individualized-sentencing requirement applies only to those sentences or their functional equivalents, of which "life imprisonment" under ORS 163.105(1)(c) (2001) is not one. We agree with the state.

As noted above, the holding in *Miller* rested on the "confluence" of *Roper* and *Graham* and the death penalty cases requiring individualized sentencing. *Miller*, 567 US at 470. Beginning with *Roper* and *Graham*, the Court first emphasized that those cases "establish that children are constitutionally different from adults for purposes of sentencing" because "juveniles have diminished culpability and greater prospects of reform." *Id.* at 471.

The Court then noted that, although "*Graham*'s flat ban on life without parole applies only to nonhomicide crimes, and the Court took care to distinguish those offenses from murder, based on both moral culpability and consequential harm[,] *** none of what it said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime specific." *Id.* at 473. Therefore, "*Graham*'s reasoning implicates *any life-without-parole sentence* imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." *Id.*

(emphasis added). Notably, the Court did not suggest at that point in its *Miller* opinion that *Graham*'s reasoning applied to sentences other than life without parole.

Turning to the sentencing schemes at hand, the *Miller* Court explained that they failed to account for the qualities of youth:

"the mandatory penalty schemes at issue \*\*\* prevent the sentencer from taking account of these central considerations. By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionally punishes a juvenile offender. That contravenes *Graham*'s (and also *Roper*'s) foundational principle: *that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children.*"

*Id.* at 474 (emphasis added).

However, the Court's analysis did not end with that defect. The Court also cited *Graham*'s likening of "life-without-parole sentences imposed on juveniles to the death penalty itself." *Id.* Specifically, the Court drew on that part of *Graham* that treated a "juvenile life sentence as analogous to capital punishment," thus implicating the Court's line of precedent "demanding individualized sentencing when imposing the death penalty." *Id.* at 475 (quotation marks omitted). And, importantly, that line of precedent established that a mitigating factor that a sentencer must be able to consider when imposing the death penalty is "the 'mitigating qualities of youth.'" *Id.* at 476 (quoting *Johnson v. Texas*, 509 US 350, 367, 113 S Ct 2658, 125 L Ed 2d 290 (1993)).

Thus,

"In light of *Graham*'s reasoning, [the death penalty] decisions too show the flaws of imposing mandatory life-without-parole sentences on juvenile homicide offenders. Such mandatory penalties by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the

same sentence as every other—the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one. *** In meting out the death penalty, the elision of all of those differences would be strictly forbidden. And once again, *Graham* indicates that a similar rule should apply when a juvenile confronts a sentence of life (and death) in prison."

*Id.* at 476-77.

From the foregoing, we understand the Court in *Miller* to have drawn on two distinct principles to conclude that a mandatory life-without-parole sentence cannot be applied to juveniles. One of them is what has been described as "*Graham*'s (and also *Roper*'s) foundational principle"— that is, that "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Miller*, 567 US at 474. The second is the Court's clearly articulated view in *Graham* that life without parole for juveniles is akin to the death penalty. *Id.* at 474-75. And, because of that similarity, the issue in *Miller*, in turn, implicated the Court's death penalty cases demanding individualized sentencing when imposing that sentence. *Id.* Neither of those two principles can be severed from the Court's analysis.

Thus, the reasoning that the Supreme Court has embraced regarding the categorical unconstitutionality of certain types of sentences for juveniles is anchored to the premise that a "true-life" sentence applied to juveniles is similar to the death penalty in ways that make it cruel and unusual to impose such a sentence without individualized procedures. It is in that light that we interpret the Court's reference in *Miller* to a state's "most severe penalties." The most natural reading of that phrase, in context, is as shorthand for the two types of sentences the Court had considered in *Roper*, *Graham*, and *Miller*: the death penalty, and life without parole. In other words, we understand the phrase "most severe penalties" in *Miller* to have an objective meaning: those two penalties. The Court of Appeals majority, by contrast, gave that language a relative meaning, requiring individualized sentencing before a state imposes any penalty that could be characterized as

among *that state's* most severe. Because that interpretation would unmoor the Eighth Amendment analysis from the Supreme Court's repeated emphasis on the unique qualities of death and life-without-parole sentences, we reject it.

*Montgomery* supports our conclusion. In *Montgomery*, the Court considered whether *Miller* announced a procedural rule or a substantive rule, *i.e.*, one that "forbids criminal punishment of certain primary conduct or prohibits a certain category of punishment for a class of defendants because of their status or offense." 577 US at 206 (internal quotation marks omitted). The Court began by explaining *Miller*'s reasoning: "the penological justifications for *life without parole* collapse in light of the distinctive attributes of youth" to such an extent that "mandatory life-without-parole sentences for children pos[e] too great a risk of disproportionate punishment." *Id.* at 208 (brackets in *Montgomery*; quotation marks omitted; emphasis added). However, the *Miller* Court did not hold that life without parole is disproportionate for *all* juveniles; it held that life without parole is disproportionate for those juveniles whose crimes reflect the "transient immaturity of youth." *Id.* And, "to separate those juveniles who may be *sentenced to life without parole* from those who may *not*," the *Miller* court imposed a procedural requirement, *i.e.* the individualized-sentencing requirement. *Id.* at 210 (emphases added). However, the *Montgomery* Court explained that the procedural component did "not replace but rather gives effect to *Miller*'s substantive holding that *life without parole* is an excessive sentence for children whose crimes reflect transient immaturity." *Id.* (emphasis added). Thus, *Montgomery*'s framing of *Miller*'s reasoning and holding supports the view that *Miller*'s individualized-sentencing requirement applies only to life-without-parole sentences.

That understanding is also reflected in *Montgomery*'s discussion of how to give *Miller* retroactive effect. The court noted that a state will not have to relitigate a sentence "in every case where a juvenile offender received *mandatory life without parole*. A State may remedy a *Miller* violation by permitting juvenile homicide offenders

to be considered for parole, rather than by resentencing them." *Id.* at 212 (emphasis added). By framing *Miller* as applying to "mandatory life without parole," *Montgomery* is consistent with the view that *Miller*'s sweep does not extend further.

Defendant, like the Court of Appeals majority, downplays the significance of *Montgomery* because that case arose in the posture of collateral review, rather than direct appeal. *See Link IV*, 297 Or App 155-56. We recognize that, in crafting remedies on collateral review, the Court weighs concerns that may not be applicable on direct appeal, such as the "burden on the States" in providing a remedy and disturbing the "finality of state convictions." *See, e.g.*, *Montgomery*, 577 US at 212 (considering those concerns). Nevertheless, *Montgomery* is replete with language that is at least consistent with, if it does not compel, the view that *Miller* is limited to life-without-parole sentences.

Numerous other courts have grappled with *Miller*'s application and have reached varying conclusions. However, the great majority of jurisdictions of which we are aware have concluded that *Miller*'s individualized-sentencing requirement applies only to a life-without-parole sentence or the functional equivalent. *See, e.g.*, *People v. Franklin*, 63 Cal 4th 267, 276, 279-80, 370 P3d 1053, 1060, 1062, *cert den*, ___ US ___, 137 S Ct 573 (2016) (explaining that "a juvenile may not be sentenced to the functional equivalent of [life without parole] for a homicide offense without the protections outlined in *Miller*," but concluding that a *Miller* claim did not arise because the defendant was not serving the functional equivalent of life without parole); *People v. Tate*, 352 P3d 959, 970 (Colo 2015) (explaining that, if life without parole was determined to be unconstitutional under *Miller* for the defendant on remand, then life with the possibility of parole was the "appropriate sentence but also constitutional," because "*Miller* does not go so far as to declare [life with the possibility of parole] unconstitutional as applied to juveniles"); *State v. Michel*, 257 So 3d 3, 7 (Fla 2018), *cert den*, ___ US ___, 139 S Ct 1401 (2019) (holding that *Miller*'s individualized-sentencing requirement does not apply to a sentence of life with the possibility

of parole after 25 years); *Commonwealth v. Okoro*, 471 Mass 51, 58, 26 NE3d 1092, 1099 (2015) (explaining that, when read as a whole, "*Miller*'s requirement of individualized sentencing was limited to instances where a state seeks to impose life in prison *without* parole eligibility on a juvenile" (emphasis in original)); *Lewis v. State*, 428 SW3d 860, 863, *cert den*, 574 US 901 (Tex Crim App 2014) ("*Miller* does not entitle all juvenile offenders to individualized sentencing. It requires an individualized hearing only when a juvenile can be sentenced to life without the possibility of parole.").[22]

---

[22] *See also State v. Vera*, 235 Ariz 571, 578, 334 P3d 754, 761 (Ariz Ct App 2014), *cert den*, 577 US 854 (2015) (explaining that life with the possibility of parole after 25 years is "consistent with the 'meaningful opportunity' for release contemplated by *Miller* and *Graham*"); *State v. Delgado,* 323 Conn 801, 810-11, 151 A3d 345, 351-52 (2016) ("The eighth amendment, as interpreted by Miller, does not prohibit a court from imposing a sentence of life imprisonment *with* the opportunity for parole for a juvenile homicide offender, nor does it require the court to consider the mitigating factors of youth before imposing such a sentence. Rather, under Miller, a sentencing court's obligation to consider youth related mitigating factors is limited to cases in which the court imposes a sentence of life, or its equivalent, *without* parole." (Emphases in original; internal citations omitted.)); *James v. US*, 59 A3d 1233, 1236-39 (DC 2013) (explaining that a mandatory minimum of 30 years without parole did not "fit into the *Miller* category" because it was not a mandatory life-without-parole sentence, but also noting that the mandatory nature of the sentence did not violate *Miller* or *Graham* because the legislature had taken youth into account when enacting the statute at issue); *State v. Tran*, 138 Hawai'i 298, 305, 307, 378 P3d 1014, 1021, 1023 (Haw Ct App 2016) (explaining that "*Miller* does not require individualized sentencing or consideration of the mitigating factors of youth in every case involving a juvenile offender, but only where a sentence of life imprisonment without parole is imposed on a juvenile offender," and also explaining that *Graham* "did not bar the imposition of mandatory penalties on juvenile offenders or require a court to consider the mitigating factors of youth at the time it imposed [a] sentence"); *State v. Shanahan,* 165 Idaho 343, 350-52, 445 P3d 152, 159-61, *cert den*, ___ US ___, 140 S Ct 545 (2019) (explaining that "the rationale of *Miller* applies to life sentences without the possibility of parole and their functional equivalents," before concluding that life without parole eligibility for 35 years was not the functional equivalent of life without parole); *State v. Brown*, 300 Kan 542, 564, 331 P3d 781, 797 (2014) (explaining that *Miller*'s rationale did not make a mandatory life-with-parole sentence unconstitutional); *State v. Vang*, 847 NW2d 248, 262 (Minn 2014) ("*Miller* did not hold that a juvenile homicide offender could not be sentenced to life imprisonment *with* the possibility of release. Instead, *Miller* held more narrowly that 'a judge or jury must have the opportunity to consider mitigating circumstances' before imposing a sentence of life in prison *without* the possibility of release on a juvenile." (Emphases in original.)); *Steilman v. Michael*, 389 Mont 512, 519-22, 407 P3d 313, 319-20 (2017), *cert den*, ___ US ___, 138 S Ct 1999 (2018) (concluding that a sentence was not *de facto* life without parole; therefore, it was not subject to *Miller*'s individualized-sentencing requirement); *State v. Nollen*, 296 Neb 94, 119-20, 892 NW2d 81, 98, *cert den*, ___ US ___, 138 S Ct 165 (2017) (holding that a sentence of 90-years to life with the possibility of parole after 45 years did not violate *Miller* or *Graham*

While a few jurisdictions have concluded that *Miller*'s individualized-sentencing requirement goes further,[23] for the reasons discussed above, we join with those courts that have held that *Miller*'s individualized-sentencing requirement is limited to life-without-parole sentences or the functional equivalent.

In sum, we conclude that the *Miller* individualized-sentencing requirement applies only when imposing a sentence of life without parole on juvenile offenders. Thus, the first step to determine whether a sentence comports with *Miller* is to determine whether the sentence is life without parole (or the functional equivalent). If the answer is yes, then the second question is whether the sentencing scheme comports with *Miller*'s individualized-sentencing requirement. Thus, we turn to the first step of that inquiry: whether a sentence of "life imprisonment" under ORS 163.105(1)(c) (2001) with a 30-year mandatory minimum term is the same as life-without-parole or the functional equivalent.

---

because it was not life-without-parole sentence, but also because the sentencing court "considered the traditional sentencing factors, along with the mitigating factors set forth" by statute); *State v. Jefferson*, 252 NC App 174, 177, 798 SE2d 121, 123 (NC Ct App 2017), *cert den,* ___ US ___, 138 S Ct 1169 (2018) ("the Supreme Court has not indicated the individualized sentencing required in *Miller* extends to sentences beyond life without parole"); *Commonwealth v. White*, 193 A3d 977, 983 (Pa Super Ct 2018), *rev den*, 215 A3d 3 (2019) (explaining that *Miller*'s individualized-sentencing requirement did not apply when imposing a 35-years-to-life sentence); *State v. Smith*, 428 SC 417, 421, 836 SE2d 348, 350 (2019) (holding that the Eighth Amendment and *Miller* did not bar mandatory minimums, including a 35-year sentence, merely, because the mandatory nature prevents the sentencer from imposing a lesser sentence if it deems leniency is appropriate in light of the defendant's youth); *State v. Barbeau*, 370 Wis 2d 736, 764-65, 883 NW2d 520, 533 (Wis Ct App 2016), *cert den*, ___ US ___, 137 S Ct 821 (2017) (explaining that "the principle that emerges from *Miller* is that for a juvenile convicted of murder, the Eighth Amendment requires that before a sentence of life imprisonment without the possibility of parole may be imposed *** a judge must be able to make an 'individualized' sentencing determination, allowing for the consideration of the juvenile's age," however, that principle was not at stake, in part, because the defendant was not sentenced to life without parole).

[23] *See State v. Patrick*, ___ NE3d ___, 2020 WL 7501940, at *7 (Ohio 2020) (explaining that *Miller* applied to a sentence of life with the possibility of parole); *State v. Houston-Sconiers*, 188 Wash 2d 1, 18-21, 391 P3d 409, 418-420 (2017) (concluding that *Miller* applies to juveniles sentenced to 26- and 31-year prison terms for robberies); *see also Lyle*, 854 NW2d at 400 (relying on *Roper*, *Graham*, and *Miller* to conclude all mandatory minimum sentences of imprisonment for youthful offenders are unconstitutional under the state constitution).

b.   Defendant's argument

Defendant, joined by *amicus* Koch, argues that the categorical rule announced in *Miller* applies to his sentence of "life imprisonment" under ORS 163.105(1)(c) (2001),[24] because that sentence is *in fact* a sentence of life without parole. That is so because, "at the time the court imposes that sentence, the defendant has no possibility of parole." That possibility arises only later—30 years later, if the defendant establishes at the murder-review hearing that he "is likely to be rehabilitated within a reasonable time," and the board determines that his sentence should be changed to life with the possibility of parole. In short, defendant reasons, *at the time of sentencing*, a sentence of "life imprisonment" under ORS 163.105(1)(c) (2001) carries no inherent opportunity for parole and is thus a life-without-parole sentence.

We reject that argument, which is essentially the same as one that we rejected in *White*. Even if defendant is correct that the proper focus is on the nature of the sentence at the time the sentence is imposed,[25] at the time "life imprisonment" under ORS 163.105(1)(c) (2001) is imposed, the entitlement to a murder-review hearing is part of that sentence; thus, the opportunity to obtain entitlement to parole at that hearing is necessarily part of the sentence as well. It is true that, as a technical matter, the sentence does not become a sentence of "life with the possibility of parole" unless and until it is so converted. However, in *White* we made it clear that the question is not what label attaches to a sentence, but, rather, whether a defendant's sentence is *in fact* the "functional equivalent" of life without parole. 365 Or at 12-14. And, that inquiry must consider the substance of the sentence, including any opportunities to convert the sentence later.

---

[24] Neither party on review has raised the possibility that ORS 163.105(1)(c) (2001) may have permitted a trial court to impose a minimum term of confinement greater than 30 years. A case involving a longer minimum term of confinement might present different questions under *Miller* as to whether such a sentence for a juvenile might be the functional equivalent to life without parole.

[25] Although we assume for sake of argument that the appropriate focus is on the nature of the sentence at the time of sentencing, we pause to note that that focus is potentially in tension with our assumption, in *White*, that good-time credit is a proper consideration when determining the contours of a sentence. *See* 365 Or at 15.

Defendant next argues that the sentencing scheme imposes the functional equivalent of life without parole because it does not provide a meaningful opportunity for release. We understand defendant to argue that the sentencing scheme does not provide a meaningful opportunity for release because it does not provide the sentencer or the board with the authority to do the type of individualized sentencing required by *Miller*. That argument, however, presumes the very thing in dispute, which is whether the individualized-sentencing requirement applies to a sentence of "life imprisonment" under ORS 163.105(1)(c) (2001). *See White*, 365 Or at 15 (turning to the question of whether the petitioner was provided individualized sentencing *after* concluding that the petitioner's sentence was the functional equivalent to life without parole).

Defendant's more substantial argument is that the murder-review hearing is not a "meaningful opportunity for release" because that hearing, itself, cannot result directly in release; rather, it can result only in a conversion of a sentence of "life imprisonment" under ORS 163.105(1)(c) (2001) to a life-with-the-possibility-of-parole sentence, with the opportunity for release on parole coming only later, at an exit-interview hearing. *See* ORS 144.125 (setting forth exit-interview hearing). Consequently, because the defendant may never prevail at a murder-review hearing, he has no guarantee that his sentence will be converted, that he will ever be afforded an exit-interview hearing, and that he will be afforded an opportunity for release. Moreover, according to defendant, the murder-review hearing is not a meaningful opportunity for release because the "default is for the board to deny relief unless the juvenile offender has satisfied the listed criteria."

Defendant accurately describes the mechanics of the statutory scheme, but his argument fails to show that the scheme does not provide a "meaningful opportunity to obtain release." That phrase has its origins in *Graham*, which, as discussed above, held that life without parole for juvenile nonhomicide offenders is cruel and unusual punishment. 560 US at 82. In reaching that holding, the Court explained that, while the Eighth Amendment bars a

sentence of life without parole, it does not bar lifetime incarceration for those who commit "horrifying crimes as juveniles" so long as they have "some meaningful opportunity to obtain release":

> "A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham *some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation*. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society."

*Id.* at 75 (emphasis added).

Additionally, in explaining why a life-without-parole sentence shared some characteristics with death sentences, the Court noted that such a sentence "deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence." *Id.* at 69-70. In doing so, the Court cited *Solem v. Helm*, 463 US 277, 300-01, 103 S Ct 3001, 77 L Ed 2d 637 (1983), where the Court discussed the difference between parole and commutation when considering the constitutionality of a life-without-parole sentence. Specifically, the court, in *Solem*, explained that

> "As a matter of law, parole and commutation are different concepts, despite some surface similarities. Parole is a regular part of the rehabilitative process. *** The law generally specifies when a prisoner will be eligible to be considered for parole, and details the standards and procedures applicable at that time. Thus, it is possible to predict,

at least to some extent, when parole might be granted. Commutation, on the other hand, is an *ad hoc* exercise of executive clemency. A governor may commute a sentence at any time for any reason without reference to any standards."

*Id*. (citations omitted).

In *Montgomery*, the Court provided further guidance about what constitutes a meaningful opportunity to obtain release when it explained how states can remedy a *Miller* violation. 577 US at 212. The Court explained that a *Miller* violation may be remedied "by permitting juvenile homicide offenders to be considered for parole." *Id.* Consideration for parole, explained the Court, "ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Id.* In other words, parole consideration gives defendants an opportunity to present evidence showing that their crime did not reflect "irreparable corruption" and, "if it did not, their hope for some years of life outside prison walls must be restored." *Id.* at 213.

*Graham*, *Solem*, and *Montgomery* provide important guidance regarding the meaning of the phrase "some meaningful opportunity to obtain release." From *Graham*, we know that such opportunity must allow for consideration of the defendant's "demonstrated maturity and rehabilitation," and, from *Montgomery*, we know that such opportunity must consider whether the crime the defendant committed reflected "irreparable corruption and, if it did not, their hope for some years of life outside prison walls must be restored." However, *Graham* also instructs that a "meaningful opportunity" does not have to *guarantee* a defendant release. 560 US at 75 ("The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life."). But, *Graham*'s reference to executive clemency, as discussed in *Solem*, suggests that a meaningful opportunity cannot be as "remote" as the clemency procedure analyzed in *Solem*; it cannot be an *ad hoc*, discretionary procedure, divorced from any legal standards.

        With that in mind, we reject defendant's argument
that the sentencing scheme does not provide a meaningful
opportunity to obtain release. As the state observes, the
scheme establishes "concrete legal standards" that entitle
defendant to convert his sentence to a life with the possibil-
ity of parole when certain conditions are met. Specifically,
the state points to the "likelihood of rehabilitation" stan-
dard set forth in ORS 163.105(2) (2001) and contends that
that standard is one that can be met by a juvenile offender
whose crime reflects the transience of youth. And the state
explained at oral argument that, if defendant's sentence is
converted, at that time or "shortly thereafter," the board will
set his release date based on the matrix system.

        The administrative rules further illuminate how
the board will apply the "likelihood of rehabilitation" stan-
dard. In making that determination, the board is guided
by OAR 255-032-0020 (2001), which sets forth relevant
"[c]riteria indicating whether the inmate is likely to be reha-
bilitated prior to release." It is true that defendant has the
burden of proof, ORS 163.105(2)(a) (2001), and that the con-
version opportunity (and, in turn, release on parole), does
not occur until defendant has served at least 30 years, ORS
163.105(2) (2001). However, if defendant meets that burden,
the board "shall enter an order *** convert[ing] the terms
of the prisoner's confinement to life imprisonment with the
possibility of parole." ORS 163.105(3) (2001); *see Haynes v.
Board of Parole*, 362 Or 15, 27, 403 P3d 394 (2017), *cert den*,
___ US ___, 138 S Ct 2000 (2018) (explaining that a previ-
ous, but substantially similar, version of ORS 163.105 used
"mandatory language that creates a presumption that the
board 'shall' change the terms of the prisoner's confinement
to life with the possibility of parole when the board makes
the designated finding"). Thus, the sentencing scheme spec-
ifies when defendant will be eligible for parole: after he
serves 30 years of confinement and after he establishes that
he is "likely to be rehabilitated within a reasonable period
of time." And the scheme also details the standards and pro-
cedures applicable at that time. Thus, unlike clemency, "it
is possible to predict, at least to some extent, when parole
might be granted." *See Solem*, 463 US at 301. And, impor-
tantly, if defendant satisfies that burden, the board must

convert the sentence into a sentence of life with the possibility of parole.

Moreover, the "likelihood of rehabilitation" standard set forth in ORS 163.105(2) (2001) and the implementing rule, OAR 255-032-0020 (2001), call for the board to consider whether defendant has demonstrated maturity and rehabilitation. In making that determination, the board considers, among other things, a defendant's "involvement in correctional treatment, medical care, education, vocational or other trainings" while incarcerated that "substantially" enhance his "capacity to lead a law-abiding life when released." OAR 255-032-0020(1) (2001). The board also considers a defendant's "maturity, stability, demonstrated responsibility, and any apparent development" in the defendant's "personality which may promote or hinder conformity to law." OAR 255-032-0020(4) (2001). Thus, while the "likelihood of rehabilitation" standard and OAR 255-032-0020 (2001) do not specifically call for consideration of the unique qualities of youth in the language of *Miller*, the focus on factors such as increased "maturity" and "apparent development" will naturally work to the advantage of a juvenile offender whose crime in fact reflected the transient immaturity of youth.

For the foregoing reasons, we are not persuaded that Oregon's sentencing scheme, which affords juvenile offenders who have served a term of 30 years the opportunity to convert their sentence to one with the possibility of parole, deprives juvenile offenders of a meaningful opportunity for release and, therefore, we are not persuaded that defendant's sentence should be considered an unconstitutional true-life sentence for purposes of the *Miller* analysis. Defendant's argument that the murder-review hearing process is not a meaningful opportunity is not persuasive.

We are mindful however, of the uncertainty regarding what may happen to defendant *after* a murder-review hearing. Neither party's briefing on review has meaningfully addressed the parole-release process that would follow if defendant's sentence is converted. However, we make the following observations.

As noted earlier in this opinion, generally the board's parole-release decisions are controlled by ORS 144.120, ORS 144.125, ORS 144.780, and ORS 144.785 and its rules implementing those statutes. Neither party has fully addressed how those statutes and rules apply to defendant. And, although we have considered how the process works under prior versions of those statutes, *see, e.g.*, *State ex rel Engweiler v. Felton*, 350 Or 592, 260 P3d 448 (2011) (construing the 1988 and 1991 statutory scheme); *Janowski/Fleming*, 349 Or 432 (construing the 1983 and 1985 statutory scheme), we declined to opine at length on how exactly that process works, but noted our expectation that the board would "*now*," *i.e.*, after converting the petitioner's sentence, conduct a hearing to "set" the petitioner's "release date according to the matrix in effect when [the petitioner] committed his crime," *Janowski*, 349 Or at 456 (emphasis added). *See also Engweiler*, 350 Or at 630 (explaining that ORS 144.120(1) (1991) entitled the defendant to "a hearing at some point to set an initial release date"). The versions of the statutory scheme that we considered in *Engweiler* and *Janowski* were amended before 2001; however, based on the state's representations at oral argument, we expect the process to be similar in that, if defendant's sentence is converted to life with the possibility of parole, then the board will determine defendant's sentence term and release date at the murder-review hearing or reasonably soon thereafter.

We further understand that, under the board's matrix rules, the board may have the choice among several presumptive sentence terms, up to and including life. The state has acknowledged that possibility and represented that defendant will have opportunities for further judicial review if he is unsatisfied with the results of those further administrative proceedings. Based on the parties' arguments and the record before us, we cannot ascertain exactly what parole-release procedures the board may follow if defendant's sentence is converted. Defendant has not developed an argument that *those* procedures will deprive him of a meaningful opportunity for release (*e.g.*, by resulting in a lengthy presumptive term). Moreover, a conclusion at this stage that the sentencing scheme is categorically unconstitutional because of the possibility that the board

*might* act, a decade or more from now, in a way that extends defendant's period of incarceration—even for life—would be difficult to reconcile with the Supreme Court's admonition that a meaningful opportunity does not mean a guarantee.

At the same time, if a sentencing scheme is to survive Eighth Amendment scrutiny by offering a meaningful opportunity for release in the form of the conversion of a sentence to life with the possibility of parole, then that scheme must also (assuming defendant successfully obtains a conversion of his sentence) employ parole-release procedures which themselves offer a meaningful opportunity for release. It would not pass constitutional muster for the board to convert defendant's sentence to life with the possibility of parole and then act in a manner that renders that "possibility" effectively meaningless. Accordingly, our conclusion that the murder-review hearing and sentence-conversion process affords defendant a meaningful opportunity for release is predicated on the state's representations that defendant will have the ability at relevant stages in the board's administrative process to demonstrate that he should be considered for release and to challenge board actions that are adverse to him. Our decision today does not preclude defendant from advancing an argument challenging the applicable parole-release procedures after conversion or the board's actions related to parole release on the basis that they deny him a meaningful opportunity for release in violation of *Miller*.

For the foregoing reasons, we conclude that defendant has not established that the statutory scheme denies him a meaningful opportunity for release. Therefore, the sentence that defendant received is not the functional equivalent of life without parole. It follows that defendant has failed to establish that *Miller*'s individualized-sentencing requirement applies to a sentence of "life imprisonment" under ORS 163.105(1)(c) (2001).

The decision of the Court of Appeals is reversed. The order of the circuit court is affirmed.