Argued and resubmitted on remand from the United States Supreme Court January 9, 2020; reversed as to BOLI's conclusion that the Kleins violated ORS 659A.409 and the related grant of injunctive relief, reversed and remanded as to damages, otherwise affirmed January 26, 2022

Melissa Elaine KLEIN,
dba Sweetcakes by Melissa;
and Aaron Wayne Klein,
dba Sweetcakes by Melissa,
and, in the alternative, individually as an
aider and abettor under ORS 659A.406,
*Petitioners,*

*v.*

OREGON BUREAU OF
LABOR AND INDUSTRIES,
*Respondent.*

Oregon Bureau of Labor and Industries
4414, 4514; A159899

506 P3d 1108

On remand from the United States Supreme Court, *Klein v. Oregon Bureau of Labor and Industries*, ___ US ___, 139 S Ct 2713, 204 L Ed 2d 1107 (2019), the Oregon Court of Appeals adhered to its prior decision upholding a determination by the Bureau of Labor and Industries (BOLI) that petitioner Aaron Klein unlawfully discriminated against the complainants, the Bowman-Cryers, by refusing to bake them a wedding cake because of their sexual orientation, in violation of ORS 659A.403, and that neither the state constitution nor the federal constitution precludes the enforcement of the statute against him. In particular, the court rejected the argument that the Supreme Court's decision in *Fulton v. Philadelphia*, ___ US ___, 141 S Ct 1868, 210 L Ed 2d 137 (2021), changed the analysis of what a "generally applicable" law is for purposes of the free exercise analysis under *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 US 872, 110 S Ct 1595, 108 L Ed 2d 876 (1990), in a way that makes application of ORS 659A.403 to Aaron's conduct violative of the First Amendment. However, on the issue of damages to be assessed for that discrimination, the Court of Appeals concluded that BOLI's handling of the damages portion of the case did not comport with the First Amendment's requirement of strict neutrality toward religion as described in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 US ___, 138 S Ct 1719, 201 L Ed 2d 35 (2018), and it set aside the damages award and remanded the decision to BOLI for further proceedings on remedy.

Reversed as to BOLI's conclusion that the Kleins violated ORS 659A.409 and the related grant of injunctive relief; reversed and remanded as to damages; otherwise affirmed.

On remand from the United States Supreme Court, *Klein v. Oregon Bureau of Labor and Industries*, ___ US ___, 139 S Ct 2713, 204 L Ed 2d 1107 (2019).

Adam R.F. Gustafson, Washington, DC, argued the cause for petitioners. Also on the opening and reply briefs were Tyler Smith, Anna Harmon, and Tyler Smith & Associates; Herbert G. Grey; C. Boyden Gray, Derek S. Lyons, and Boyden Gray & Associates, Washington, DC; and Matthew J. Kacsmaryk, Kenneth A. Klukowski, Cleve W. Doty, and First Liberty Institute, Texas. Also on the supplemental opening brief were Herbert G. Grey; C. Boyden Gray, James R. Conde, and Boyden Gray & Associates, Washington, DC; and Kelly J. Shackelford, Hiram S. Sasser, III, Kenneth A. Klukowski, Michael D. Berry, Stephanie N. Taub, and First Liberty Institute, Texas. Also on the supplemental reply brief were Herbert G. Grey; C. Boyden Gray, James R. Conde, and Boyden Gray & Associates, Washington, DC; and Kelly J. Shackelford, Hiram S. Sasser, III, Michael D. Berry, Stephanie N. Taub, and First Liberty Institute, Texas.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent. Also on the answering brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Leigh A. Salmon, Assistant Attorney General. Also on the supplemental brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Stefan C. Johnson, Jennifer C. Pizer, and Lambda Legal Defense and Education Fund, Inc., California; and Paul A. Thompson filed the brief *amici curiae* for Rachel Bowman-Cryer, Laurel Bowman-Cryer, and Lambda Legal Defense and Education Fund, Inc.

P. K. Runkles-Pearson and Miller Nash Graham & Dunn LLP; and Kelly K. Simon and ACLU of Oregon, Inc., filed the brief *amicus curiae* for ACLU Foundation of Oregon, Inc.

Before James, Presiding Judge, and Lagesen, Chief Judge, and DeVore, Senior Judge.

LAGESEN, C. J.

Reversed as to BOLI's conclusion that the Kleins violated ORS 659A.409 and the related grant of injunctive relief; reversed and remanded as to damages; otherwise affirmed.

**LAGESEN, C. J.**

This case is on remand to us from the United States Supreme Court. The Court vacated and remanded our previous decision, *Klein v. BOLI*, 289 Or App 507, 410 P3d 1051 (2017), *rev den*, 363 Or 224 (2018) (*Klein I*), "for further consideration in light of *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 US ___, 138 S Ct 1719, 201 L Ed 2d 35 (2018)." *Klein v. Oregon Bureau of Labor and Industries*, ___ US ___, 139 S Ct 2713, 2713, 204 L Ed 2d 1107 (2019) (*Klein II*). It subsequently decided *Fulton v. Philadelphia*, ___ US ___, 141 S Ct 1868, 210 L Ed 2d 137 (2021), and petitioners argue that *Fulton*, too, requires reconsideration of our prior analysis.

Given this procedural history, the particular issue before us is whether the Supreme Court's approach to the Free Exercise Clause of the First Amendment to the United States Constitution in *Fulton* and *Masterpiece Cakeshop* calls into question our previous determinations that (1) petitioner Aaron Klein, who operates a bakery, unlawfully discriminated against complainants Rachel and Laurel Bowman-Cryer based on their sexual orientation, in violation of ORS 659A.403, when he refused to provide them with a wedding cake because of his religious beliefs about marriage of couples of the same sex; (2) the Free Exercise Clause does not bar the enforcement of that statute against Aaron; and (3) the Bureau of Labor and Industries (BOLI) permissibly awarded noneconomic damages to Rachel and Laurel based in part on a conversation about faith between Aaron and Rachel's mother, Cheryl McPherson, that, according to BOLI's factual findings, Cheryl recounted inaccurately to Rachel and Laurel.[1]

Ultimately, we reaffirm our prior decision except insofar as it upheld the damages award. Specifically, we adhere to our prior decision upholding BOLI's determinations that Aaron unlawfully discriminated against the

---

[1] In our prior decision, we also concluded that BOLI erred when it determined that petitioners Aaron and Melissa Klein violated a different statute, ORS 659A.409, through statements that they made after Aaron refused to supply the Bowman-Cryers with a wedding cake. No party suggests that the Supreme Court's recent decisions displace that aspect of our previous decision.

Bowman-Cryers based on sexual orientation, in violation of ORS 659A.403, and concluding that neither the state constitution nor the federal constitution precludes the enforcement of the statute against Aaron, even though the enforcement of the statute burdens Aaron's practice of his faith. We reach a different conclusion with respect to our prior affirmance of BOLI's noneconomic damages award.

In so doing, we conclude that *Fulton* does not displace our previous conclusion that ORS 659A.403 is a generally applicable and neutral law and, consequently, that, under *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 US 872, 110 S Ct 1595, 108 L Ed 2d 876 (1990), the Free Exercise Clause does not preclude its enforcement even where, as here, a person's failure to comply with the law stems from the person's adherence to faith obligations. We conclude further, though, that, when viewed in the light of *Masterpiece Cakeshop*, BOLI's handling of the damages portion of the case does not reflect the neutrality toward religion required by the Free Exercise Clause. We therefore set aside the damages portion of the order and remand for further proceedings related to remedy.

## I. FACTUAL BACKGROUND

The first time it was before us, this case required us to resolve a range of issues. Now, the procedural history has landed our focus on a narrower question: whether the agency order on review comports with the Free Exercise Clause, in view of the Supreme Court's later decisions in *Fulton* and *Masterpiece Cakeshop*.

To provide context for our analysis, we set forth the substantive and procedural facts relevant to that question. As is our usual practice, we draw the substantive facts from the unchallenged factual findings in the order on review, "together with facts in the record consistent with those findings." *OR-OSHA v. United Parcel Service, Inc.*, 312 Or App 424, 425 n 2, 494 P3d 959 (2021); *see Klein I*, 289 Or App at 511 n 1 (explaining that, under Oregon law, an agency's unchallenged factual findings supply the facts for the purpose of judicial review). When drawing facts from the testimony at the damages hearing, some of which was conflicting, we do so in a manner that resolves conflicts in accordance

with the express credibility findings contained in the order on review.

This matter arose after petitioners Melissa and Aaron Klein, doing business as a bakery called Sweetcakes by Melissa, declined to provide a wedding cake to the Bowman-Cryers. The Kleins did so in accordance with their religious beliefs, which do not recognize marriages between two persons of the same sex and treat the celebration of marriages between two persons of the same sex as sinful.

The Bowman-Cryers met in college in 2004 and soon became a couple. In 2011, they became foster parents to two children and, in 2012, they decided to get married. Excited about getting married, they began to plan their wedding. Sometime after getting engaged, Rachel and her mother, Cheryl, attended a bridal show in Portland. Melissa had a booth for Sweetcakes by Melissa, advertising the bakery's wedding cakes. Two years earlier, Sweetcakes by Melissa had made the wedding cake for Cheryl's wedding; Rachel liked the cake. Rachel told Melissa that she wanted to order a wedding cake from her and, following the show, made an appointment for a cake tasting at Sweetcakes by Melissa. Both Rachel and Laurel were excited about getting a cake from Sweetcakes by Melissa because of how much they liked the cake that the bakery had made for Cheryl's wedding.

On the scheduled date, Rachel and Cheryl went to Sweetcakes by Melissa for the tasting. At the time, Aaron and Melissa had infant twins and, that day, had arranged for Aaron to handle the cake tasting while Melissa cared for the twins at home. During the tasting, Aaron asked for the names of the bride and the groom. Rachel responded that there would be two brides and their names were "Rachel and Laurel."

Upon hearing that, Aaron, because of his religious beliefs, apologized and stated that they "do not do cakes for same-sex weddings." Rachel started to cry. She felt that she had humiliated her mother, and worried that her mother was ashamed of her, because Cheryl had believed that being gay was wrong until a few years earlier. Cheryl took Rachel by the arm and walked her to the car; Rachel remained distraught and kept apologizing to her mother. Once in the

car, Cheryl hugged Rachel and told her that they would find someone to make a wedding cake. They drove a short distance away, but then Cheryl decided she wanted to return to the bakery to talk to Aaron about the change in her own religious perspective. Although Rachel did not want her to do so, Cheryl wanted to make it, in her words, a "teaching moment" because "but for the grace of God, that was me just a few years ago."

On returning to the bakery, Cheryl went in by herself while Rachel remained in the car. Cheryl explained to Aaron that she used to share his views, but that her truth had changed when God gave her two gay children. In response, Aaron asked about what the Bible said on the topic and then quoted Leviticus 18:22 to Cheryl: "You shall not lie with a male as one lies with a female; it is an abomination."

Recognizing that Aaron was "not ready to hear [her] truth," Cheryl left the bakery. She returned to the car and reported to Rachel that Aaron had said that "her children were an abomination unto God."

Hearing that Aaron had called her "an abomination," Rachel cried harder. Rachel, who had been raised Southern Baptist, felt "like they were saying God made a mistake when he made me, that I wasn't supposed to be, that I wasn't supposed to love or be loved or have a family or live a good life and one day go to heaven."

Rachel and Cheryl returned home, where Rachel immediately went to her bedroom crying. Cheryl told Laurel what had happened, including that Aaron had said "your children are an abomination." Laurel, who was raised Catholic, recognized Aaron's statement as a reference to Leviticus. She took it as an assertion that "this is a creature not created by God, not created with a soul; they are unworthy of holy love; they are not worthy of life." Laurel felt shame and anger and was unable to console Rachel.

Laurel submitted a consumer complaint to the Oregon Department of Justice. Later, Rachel filed a verified complaint with BOLI, alleging that Sweetcakes by Melissa had discriminated against her based on her sexual orientation, in violation of ORS 659A.403. A few months after

Rachel, Laurel filed her own BOLI complaint, also alleging discrimination based on sexual orientation.

BOLI investigated the complaints. Upon completing the investigation and determining the complaints to be supported by evidence, it filed formal charges against the Kleins. The charges alleged violations of both ORS 659A.403, which prohibits a place of public accommodation from discriminating based on sexual orientation, and ORS 659A.409, which, generally speaking, prohibits a place of public accommodation from publishing any notice "to the effect" that the place will deny services for impermissibly discriminatory reasons, or otherwise engage in unlawful discrimination. The charges also alleged that Aaron had aided and abetted unlawful discrimination by Melissa, in violation of ORS 659A.406.

The case was assigned to the Office of Administrative Hearings for a contested case hearing. On cross-motions for summary determination, an administrative law judge (ALJ) determined that the undisputed facts demonstrated, as a matter of law, that Aaron had violated ORS 659A.403, but had not violated ORS 659A.409. The ALJ determined that Melissa had not violated either statute and, further, that Aaron, consequently, had not aided and abetted Melissa, in violation of ORS 659A.406. In making those determinations, the ALJ rejected the Kleins' contentions that the speech and religion clauses of the First Amendment precluded them from being held liable under Oregon's antidiscrimination laws. The ALJ similarly rejected a contention that three provisions of the Oregon Constitution, Article I, sections 2 and 3, which protect religious rights, and Article I, section 8, which protects speech rights, precluded the application of Oregon's antidiscrimination laws to the Kleins' conduct.

Having resolved the issue of liability on summary determination, the case proceeded to a six-day contested hearing on damages. BOLI sought a minimum of $150,000 in noneconomic damages against the Kleins, at least $75,000 each for Rachel and Laurel.

One disputed factual issue at the damages hearing was what Aaron had said to Cheryl when she returned to the bakery to tell him about how her views had changed. Cheryl

testified that Aaron had said, "Well, I'm sorry, ma'am, but your children are an abomination." Aaron, in contrast, testified that, in response to Cheryl's explanation as to how her religious views had changed, he "simply stated, 'Why would the Bible say'—and I quoted Leviticus. I did not say it to harm her kids. I did not say it to belittle anybody."

In closing argument, the parties addressed the role of the Kleins' religious views, and, in particular, what damages, if any, should be awarded in connection with Aaron's quotation of Leviticus. Addressing the issue of the Kleins' right to hold their own religious beliefs, the prosecutor asserted that the public accommodations law was not a restriction on the freedom to have "prejudices" but, instead, a restriction on acting on those "prejudices" in providing a public accommodation:

> "I wanted to end on talking about public accommodation, in general. This was enacted in 1953 in an effort to end a long history of racial segregation in Oregon. And when I was looking through the history, I came across a quote that was cited to an editorial by an unknown author called 'Missing the Point on "Freedom"' and appeared in 'The Oregonian' on May 21st, 1953, and it said, 'Oregonians are free to harbor whatever prejudices they choose. The civil rights law does not attempt to control prejudice, rather it outlaws overt acts of discrimination in public accommodation.'

> "That's exactly what's going on in this case. The Kleins, of course, are allowed to feel and hold whatever beliefs they hold dear to them. But when they operate in a public place and provide goods and services to the public, they have to do so without discrimination."

Both sides also addressed the issue of what damages, if any, should be awarded based on the emotional distress that Rachel and Laurel suffered upon Cheryl's recounting of Aaron's alleged statement. With respect to Rachel, the prosecutor argued that the conversation "made her feel like she was a mistake, that she wasn't entitled to love, that she wasn't entitled to a family, and that she'd be barred from heaven." With respect to Laurel, the prosecutor argued:

> "When I asked her how it made her feel to hear the word 'abomination,' she said she couldn't imagine someone who

didn't know them basically saying they were unworthy of love and unworthy of life. She also feared that it would affect this tenuous new relationship with Cheryl and having Cheryl in their lives."

Responding to the point, the Kleins' lawyer pointed out both that neither Rachel nor Laurel had been present when Aaron made the statement and that, according to Aaron, he had not made the statement that Cheryl reported. Instead, Aaron "quot[ed] a scripture verse."

In rebuttal, the BOLI prosecutor disputed that Aaron had quoted a Bible verse but asserted that it "doesn't really matter" what he actually said. The prosecutor argued that what mattered was that Aaron used the word "abomination," and how that word affected Rachel and Laurel:

> "The reference to 'abomination.' We specifically asked what that word made them feel like, and that's important because how it was couched doesn't really matter; the word is what resonated with the Complainants."

In his proposed order, the ALJ credited Aaron's testimony about what he had said to Cheryl. The ALJ did so based on the fact that he had previously determined the content of Aaron's statement during the summary determination phase of the case, something that, in the ALJ's view, obviated the need to address the conflict presented by Cheryl's testimony. The ALJ, in addition, made explicit credibility findings. Regarding Aaron, the ALJ found that he was a credible witness in all but the part of his testimony that addressed a Facebook post made after the date he refused service to the Bowman-Cryers. Regarding Cheryl, the ALJ declined to credit portions of her testimony, explaining that because of "exaggerations" in her testimony, "the forum has only credited [Cheryl's] testimony when it was either (a) undisputed, or (b) disputed but corroborated by other credible testimony."

Despite those credibility findings, the ALJ, nevertheless, proposed awarding damages in part to compensate Rachel and Laurel for the emotional distress that they experienced upon Cheryl telling them that Aaron had said that her children were abominations. Discussing the emotional suffering that it caused Rachel, the ALJ determined:

> "When [Cheryl] told her that [Aaron] had called her 'an abomination,' this made [Rachel] cry even more. [Rachel], who was brought up as a Southern Baptist, interpreted [Aaron's] use of the word 'abomination' [to] mean that God made a mistake when he made her, that she wasn't supposed to exist, and that she had no right to love or be loved, have a family, or go to heaven."

Discussing the emotional suffering that it caused Laurel, the ALJ determined:

> "When [Cheryl] and [Rachel] arrived home on January 17, 2013, after their cake tasting at Sweetcakes, [Cheryl] told [Laurel] that [Aaron] had told them that Sweetcakes did 'not do same-sex weddings' and that [Aaron] had told Cheryl that 'your children are an abomination.' [Laurel] was 'flabbergasted' and she became very upset and very angry. [Laurel], who was raised as a Roman Catholic, recognized [Aaron's] statement as a reference from Leviticus. She was 'shocked' to hear that [Aaron] had referred to her as an 'abomination.' Based on her religious background, she understood the term 'abomination' to mean 'this is a creature not created by God, not created with a soul. They are unworthy of holy love. They are not worthy of life.' Her immediate thought was that this would never have happened, had she not asked [Rachel] to marry her. Because of that, she felt shame. Like [Rachel], she also worried about how it would affect [Cheryl's] relatively recent acceptance of [Rachel's] sexual orientation."

Ultimately, the order proposed awarding a total of $135,000 in noneconomic damages, $75,000 to Rachel and $60,000 to Laurel.

The Kleins and BOLI both filed numerous exceptions to the proposed order with the BOLI commissioner. Among other things, the Kleins asserted that damages were not appropriate for the distress caused by Cheryl's report about what Aaron had said, considering that the ALJ's own factual findings determined that Aaron had not said what Cheryl reported he had:

> "Finally, the findings concerning [Cheryl's] false statement attributed to [Aaron] 'that your children are an abomination' and [Laurel's] reactions to it, are not a result of the denial of cake services and are therefore irrelevant in their entirety, especially since they are inconsistent with

the earlier finding that [Aaron] made no such statement to [Cheryl]. Even worse, it was error for the ALJ to attribute legal responsibility to [Aaron and Melissa] for the false statement by Cheryl, an intervening cause which could not conceivably result in damage to Complainants, who weren't present to hear it."

(Record citations omitted.)

The commissioner largely adopted the ALJ's order as BOLI's final order, including the proposed damages award, although he rejected the ALJ's determination on summary determination that the Kleins had not violated ORS 659A.409. On that point, BOLI determined to the contrary that both Aaron and Melissa violated that statute by making certain statements during a television interview about the case, and by taping a statement addressing their intent to adhere to their religious beliefs to the door of the bakery.

On the disputed point of what Aaron had said to Cheryl, BOLI adopted the finding that Aaron had quoted Leviticus to Cheryl. In so doing, BOLI eliminated the statement, contained in the ALJ's proposed order, that suggested the summary determination ruling obviated the need to resolve the conflict between Cheryl's version of events and Aaron's.

BOLI also adopted credibility findings that the ALJ had made, including the ones specifically addressing the credibility of Aaron and Cheryl. Finally, BOLI adopted the ALJ's determinations about the emotional distress suffered by Rachel and Laurel upon being told by Cheryl of Aaron's statement.

The Kleins petitioned our court for judicial review of the final order, as permitted by the Oregon Administrative Procedures Act (APA). On review, we upheld BOLI's determination that Aaron engaged in unlawful discrimination, in violation of ORS 659A.403, by refusing to provide a cake to Rachel and Laurel on account of their sexual orientation. *Klein I*, 289 Or App at 510-11. In so doing, we rejected a range of arguments asserting that the speech and free exercise clauses of the First Amendment, and Article I, sections 2, 3, and 8, of the Oregon Constitution precluded the

application of the statute to the Kleins because of the burden that it imposed on their ability to express and practice their religious views. *Id.* We reversed the final order insofar as it concluded that the Kleins violated ORS 659A.409 by making the statements identified by the commissioner as the basis for liability. *Id.* at 511.

We also rejected the Kleins' argument that the order did not satisfy the substantial evidence or substantial reason standards imposed by ORS 183.482(8)(c). *Id.* at 559. In particular, we rejected the Kleins' argument that the order lacked substantial reason because it awarded damages "for harm attributable to being called 'abomination[s],'" but had found, as fact, that Aaron had not said that. *Id.* Pointing to the fact that the BOLI prosecutor had argued in closing that it did not matter exactly how it was "couched," as well as aspects of the final order that appeared focused on the effect of the word "abomination" on the Bowman-Cryers, we reasoned that BOLI's order was not premised on a finding that Aaron had, in fact, called Rachel and Laura "abomination[s]." *Id.* (alterations in *Klein I*). Rather, we concluded, it was based on a finding that Aaron had used the term "abomination" in the course of explaining why he was denying service to the complainants on account of their sexual orientation, and that his use of the word caused harm, regardless of what he had actually said to Cheryl. *Klein I*, 289 Or App at 559-60. Relying on that line of reasoning, we rejected the Kleins' contention that the damages award was inconsistent with BOLI's credibility determinations, and that it otherwise was not supported by substantial reason. *Id.*

The Kleins petitioned the Oregon Supreme Court for review of our decision but that court denied review. *Klein v. Bureau of Labor and Industries*, 363 Or 224, 434 P3d 25 (2018). They then petitioned the United States Supreme Court for *certiorari*. That court granted *certiorari*, vacated our decision, and remanded to us for reconsideration in light of its decision in *Masterpiece Cakeshop. Klein II*, ___ US at ___, 139 S Ct at 2713.

On remand, the parties submitted supplemental briefs and provided oral argument, addressing what bearing

*Masterpiece Cakeshop* has on our review on reconsideration of BOLI's final order. Following the United States Supreme Court's decision in *Fulton*, the Kleins moved for leave to file a memorandum of additional authorities to address the potential application of the Free Exercise Clause analysis in that case. We allowed the motion.

## II.   ANALYSIS

This procedural history gives us two related Free Exercise Clause issues to resolve: (1) whether, in view of *Fulton*, ORS 659A.403 is a "generally applicable" law for purposes of the *Smith* framework; and (2) whether, in view of *Masterpiece Cakeshop*, the order on review comports with the First Amendment's requirement that government action be neutral toward religion. Both questions are legal questions, implicating the agency's interpretation and application of the requirements of the First Amendment. That means our review is for errors of law.[2] ORS 183.482(8)(a); *Green Thumb Landscape and Maintenance v. BOLI*, 304 Or App 349, 350, 467 P3d 43, *rev den*, 366 Or 826 (2020).

### A.   Fulton

We start with the Kleins' argument that *Fulton* requires reversal. In our original opinion, we rejected the Kleins' contention that the application of ORS 659A.403 to their conduct violated their rights under the Free Exercise Clause of the First Amendment, as it applies to the states via the doctrine of incorporation. Relying on *Smith*, we concluded that ORS 659A.403 is a "neutral" and "generally

---

[2] Although the Kleins' briefing before BOLI and in their initial briefing to us did not fully anticipate the direction the law would take in either *Fulton* or *Masterpiece Cakeshop*, this case, from the start, has centered on the question of whether the application of the law to the Kleins' conduct is consistent with their rights under the First Amendment, including the Free Exercise Clause. In particular, the Kleins asserted in their opening brief to us that BOLI's application of ORS 659A.403 to the Kleins "was, at best, discretionary and done *for the specific purpose* of forcing business owners with moral reservations about same-sex marriage to either violate their consciences or go out of business. That is impermissible targeting." (Emphasis in original.) They also questioned whether the law, as written or as applied, was neutral and generally applicable for purposes of the Free Exercise Clause. Under those circumstances, we consider it appropriate to consider the Kleins' arguments on remand about how *Fulton* and *Masterpiece Cakeshop* bear on the Free Exercise Clause issues that they raised in their initial appellate brief to us.

applicable" law and, consequently, did "not offend the Free Exercise Clause simply because" of its incidental effect of burdening the Kleins' practice of religion. *Klein I*, 289 Or App at 544-45.

In their memorandum of additional authorities, the Kleins argue that *Fulton* requires a different conclusion. In particular, they assert that, under *Fulton*, ORS 659A.403 is not a "generally applicable" law for purposes of the Free Exercise Clause analysis under *Smith*.

We disagree. In *Fulton*, the Court considered a free exercise challenge to the City of Philadelphia's foster-care contract policy, which prohibited discrimination based on sexual orientation. Under the policy, the city required an organization contracting with the city to provide foster care services to agree to a standard contractual provision stating that the organization "'shall not reject a child or family including, but not limited to, *** prospective foster or adoptive parents, for Services based upon *** their *** sexual orientation *** unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion.'" *Fulton*, ___ US at ___, 141 S Ct at 1878. The plaintiff, Catholic Social Services (CSS), a foster care agency in the city, argued that the policy, as applied to it, violated its free exercise rights because CSS's religious views prohibited it from certifying married couples of the same sex as foster care providers. *Id.* at ___, 141 S Ct at 1875-76.

The Court agreed with CSS. It reasoned that the policy's allowance of discretionary exceptions to the nondiscrimination bar meant that the policy was not "generally applicable" for purposes of *Smith*. *Id.* at ___, 141 S Ct at 1878. In other words, under *Fulton*, to be "generally applicable," a law cannot have carved-out individual exceptions; individual exceptions defeat the notion of generality. Further, when a law "incorporates a system of individual exemptions" that are discretionary, the Free Exercise Clause mandates the provision of a religious-hardship exemption, unless there is a compelling reason not to supply a religious-hardship exemption. *Id.* The Court concluded that the city had identified no such compelling interest in that case. *Id.* at ___,

141 S Ct at 1881-82. It reasoned that the city's interest "in the equal treatment of prospective foster parents and foster children," although a "weighty one," was not an interest that could justify the denial of a religious-hardship exemption to CSS in light of the exceptions available to others. *Id.* at ___, 141 S Ct at 1882.

In their memorandum of additional authorities, the Kleins urge us to conclude that *Fulton* controls this case. Notably, however, the Kleins do not argue—and could not argue—that the prohibition on discrimination based on sexual orientation by places of public accommodation in ORS 659A.403 allows for individual exceptions. As written, ORS 659A.403 (2011),[3] without exception or allowances for discretionary exceptions, bars discrimination based on sexual orientation by places of public accommodation:

"(1)  Except as provided in subsection (2) of this section, all persons within the jurisdiction of this state are entitled to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, without any distinction, discrimination or restriction on account of race, color, religion, sex, sexual orientation, national origin, marital status or age if the individual is 18 years of age or older.

"(2)  Subsection (1) of this section does not prohibit:

"(a)  The enforcement of laws governing the consumption of alcoholic beverages by minors and the frequenting by minors of places of public accommodation where alcoholic beverages are served; or

"(b)  The offering of special rates or services to persons 50 years of age or older.

"(3)  It is an unlawful practice for any person to deny full and equal accommodations, advantages, facilities and privileges of any place of public accommodation in violation of this section."

ORS 659A.403 (2011).

Faced with this exception-free statute when it comes to the prohibition on discrimination based on sexual

---

[3] The legislature has amended ORS 659A.403 several times since BOLI initiated this case; none of the amendments bears on the issues presented here.

orientation,[4] the Kleins look elsewhere for exceptions: the Oregon Constitution. They point out—correctly—that the Oregon Supreme Court has stated in several cases, originating with *Cooper v. Eugene Sch. Dist. No. 4J*, 301 Or 358, 368-69, 723 P2d 298 (1986), that Article I, sections 2 and 3, of the Oregon Constitution allow for an individual claim to a religious exemption from the application of a general law: "With regard to rules that are generally applicable and neutral toward religion, however, the only issues for us to consider are whether there was 'statutory authority to make such a regulation,' or whether we should grant 'an individual claim to exemption on religious grounds.'" *See State v. Hickman*, 358 Or 1, 15-16, 358 P3d 987 (2015) (quoting *Cooper*, 301 Or at 368-69); *State v. Brumwell*, 350 Or 93, 108, 249 P3d 965 (2011) (reiterating that where a law is neutral toward religion and generally applicable, the only issues under Article I, sections 2 and 3, are the authority to promulgate the law and an individual claim to an exemption on religious grounds). From that Oregon Supreme Court mention of individual claims to exemptions on religious grounds, the Kleins reason that (1) ORS 659A.403 allows for exceptions by way of Article I, sections 2 and 3, if not its own text; and (2) under *Fulton*, a religious exemption to ORS 659A.403 must be extended to them because, also under *Fulton*, the state's interest in nondiscrimination is insufficient to justify the denial of a religious exemption.

We do not read *Cooper*, *Hickman*, *Brumwell*, or any of the other cases that have quoted *Cooper* on the point, to stand for the proposition that Article I, sections 2 and 3,[5] grant Oregon courts the *discretion* to grant religious exemptions from generally applicable, neutral statutes that do not

---

[4] We acknowledge that the text of the statute contains exceptions to the prohibition on age discrimination. *See Dalbeck v. Bi-Mart Corp.*, 315 Or App 129, 131-40, 500 P3d 711 (2021) (analyzing the scope of the statutory exceptions to the bar on age discrimination contained in ORS 659A.403). The Kleins do not suggest that the exceptions to the bar on age discrimination supply an exception to the bar on discrimination based on sexual orientation and, in any event, any such suggestion would be implausible as a textual matter.

[5] Article I, section 2, of the Oregon Constitution states: "All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences." Article I, section 3, of the Oregon Constitution states: "No law shall in any case whatever control the free exercise, and enjoyment of religeous [*sic*] opinions, or interfere with the rights of conscience."

contain their own, legislatively crafted exceptions. That would be a potentially vast, and unusual, conferral of legislative authority on the courts, and is not something that follows in any obvious way from the text of Article I, sections 2 and 3, or the structure of the government under the Oregon Constitution.

Instead, we read the Oregon Supreme Court's cases to stand for the proposition that an individual may be able to make a case that those provisions, *as a matter of law*, require the grant of a religious exemption to a generally applicable and neutral law. To make a case that either Article I, section 2, or Article I, section 3, compelled the recognition of individual religious exemptions from a generally applicable, neutral statute, an individual would need to demonstrate, under Oregon's well-established methodology for construing the original provisions of our state constitution, that one or both of those provisions require an individual exemption to a generally applicable law. *See generally Priest v. Pierce*, 314 Or 411, 416, 840 P2d 65 (1992). That is, the individual would need to demonstrate that, in light of "[i]ts specific wording, the case law surrounding it, and the historical circumstances that led to its creation," either Article I, section 2, or Article I, section 3, requires a grant of an individual religious exemption under the circumstances present here. *Id.* at 415-16; *see* Hon. Jack L. Landau, *An Introduction to Oregon Constitutional Interpretation*, 55 Willamette L Rev 261, 318 (2019) (explaining that Oregon courts discern the meaning and application of state constitutional provisions through "analysis of the text of a provision in its historical context, with a view to discerning how that provision would have been understood at the time of its adoption and what general principles animated that understanding").

In this case, as we observed in our original opinion, the Kleins have not developed an argument under the *Priest* framework that Article I, sections 2 and 3, require the grant of a religious exemption from ORS 659A.403. *Klein I*, 289 Or App at 549 ("The Kleins have not offered a focused argument for why the Oregon Constitution requires an exemption in this case, under the methodology for interpreting our constitution."). They did not do so in their original briefs to us, and they have not done so now. Beyond that, if

the Kleins had developed and prevailed on an argument in accordance with the *Priest* framework that Article I, section 2 or 3, requires that they be granted an exemption from ORS 659A.403, then there would be no need to consider *Fulton* or the First Amendment at all. That is, if the Kleins had shown under the applicable interpretive framework that those provisions require the grant of an individual exemption, then the Kleins would have obtained the relief they sought under the provisions of the Oregon Constitution, without regard to *Fulton*.[6]

For those reasons, the Kleins have not demonstrated that *Fulton* alters our prior conclusion that ORS 659A.403 is a "generally applicable" law for purposes of *Smith*, nor our related conclusion that, under *Smith*, the application of the law to Aaron's conduct of denying cake-making services based on sexual orientation does not violate the Kleins' rights under the Free Exercise Clause. *Klein I*, 289 Or App at 543-50.

B.   Masterpiece Cakeshop

The remaining question is how, if at all, the Supreme Court's decision in *Masterpiece Cakeshop* bears on our assessment of the order on review. Before addressing the parties' competing arguments about how that case affects this one, we set forth the key facts of that case and, then, our understanding of the job the United States Supreme Court has given us.

Much like this case, *Masterpiece Cakeshop* involved a Colorado agency's determination that a baker, Phillips, and his bakery, Masterpiece Cakeshop, violated the state's antidiscrimination laws by refusing to supply a wedding

---

[6] By omitting to develop state constitutional analysis in presenting their claims to us, the Kleins overlooked Oregon's longstanding and preferred approach to constitutional questions, under which claims are to be addressed under the state constitution before they are addressed under the federal constitution. Although preferred, Oregon's approach to resolving constitutional questions under the state constitution before considering the federal constitution generally is not a basis on which to depart from "the bedrock principle of appellate jurisprudence that courts generally should decide cases as framed by the parties' properly raised and preserved arguments," particularly where an appellant has multiple opportunities to develop the state constitutional argument but has not done so. *State v. Link*, 367 Or 625, 640-42, 482 P3d 28 (2021).

cake to a same-sex couple. *Masterpiece Cakeshop*, 584 US at
___, 138 S Ct at 1723. As here, the agency rejected Phillips's
claim that the application of the state's prohibition on dis-
crimination violated his free exercise rights, relying on
*Smith*. *Id.* at ___, 138 S Ct at 1726. The Colorado Court of
Appeals affirmed, also relying on *Smith*, and the Colorado
Supreme Court denied review. *Id.* at ___, 138 S Ct at 1727.

On Phillips's petition, the United States Supreme
Court granted *certiorari*. *Id.* Ultimately, though, the Court
never addressed the question of the legal correctness of the
agency's (and the court's) ruling. *Id.* at ___, 138 S Ct at 1729.
Instead, the Court set aside the agency's decision based on its
determination that the agency's "treatment of Phillips' case
violated the State's duty under the First Amendment not to
base laws or regulations on hostility to a religion or religious
viewpoint." *Id.* at ___, 138 S Ct at 1731. The court explained
that the "requisite religious neutrality *** must be strictly
observed," and determined that "the Commission's consider-
ation of Phillips' case was neither tolerant nor respectful of
Phillips' religious beliefs." *Id.* at ___, 138 S Ct at 1731-32.

In reaching that conclusion, the Court stressed that
"[t]he Free Exercise Clause bars 'even subtle departures
from neutrality' on matters of religion," and cautioned that
"[t]he Constitution 'commits government itself to religious
tolerance, and upon even slight suspicion that proposals for
state intervention stem from animosity to religion or dis-
trust of its practices, all officials must pause to remember
their own high duty to the Constitution and the rights it
secures.'" *Id.* at ___, 138 S Ct at 1731 (quoting *Church of
Lukumi Babalu Aye, Inc. v. Hialeah*, 508 US 520, 534, 547,
113 S Ct 2217, 124 L Ed 2d 472 (1993)).

The Court expanded on its decision in *Church of
Lukumi Babalu Aye, Inc*. That case addressed whether a
legislative decision—a city ordinance—comported with the
First Amendment's neutrality requirement. In *Masterpiece
Cakeshop*, the Court projected the principles of *Church of
Lukumi Babalu Aye, Inc*. onto a different field: direct appel-
late review of an adjudicative decision. The Court explained
that in evaluating the religious neutrality of a legislative
or adjudicative action, "[f]actors relevant to the assessment

of government neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision-making body.'" *Id.* at \_\_\_, 138 S Ct at 1731 (quoting *Church of Lukumi Babalu Aye, Inc.*, 508 US at 540).

Considering the whole record of the proceedings, the Court determined that "[t]he Civil Rights Commission's treatment of [Phillips's] case has some elements of a clear and impermissible hostility toward the sincere religious beliefs that motivated his objection." *Id.* at \_\_\_, 138 S Ct at 1729. The Court identified two primary things that led it to "draw the inference that Phillips' religious objection was not considered with the neutrality that the Free Exercise clause requires": (1) statements by the commissioners during the proceedings that were dismissive of the baker's religious beliefs and that were not discussed or disavowed on review by the Colorado Court of Appeals; and (2) the commission's differential treatment and allowance of other conscience-based objections to application of the antidiscrimination law. *Id.* at \_\_\_, 138 S Ct at 1730-32.

As to statements, the Court observed that, during the course of the proceedings, members of the commission "endorsed the view that religious beliefs cannot legitimately be carried into the public sphere or commercial domain, implying that religious beliefs and persons are less than fully welcome in Colorado's business community." *Id.* at \_\_\_, 138 S Ct at 1729. It supported that observation by pointing to statements by some of the commissioners during the public hearings on the case. At the first hearing,

> "One commissioner suggested that [the baker] can believe 'what he wants to believe,' but cannot act on his religious beliefs 'if he decides to do business in the state.' A few moments later, the commissioner restated the same position: '[I]f a business man wants to do business in the state and he's got an issue with the—the law's impacting his personal belief system, he needs to look at being able to compromise.'"

*Id.* (record citations omitted). The Court noted that although those statements were susceptible to a benign interpretation,

they also "might be seen as inappropriate and dismissive comments showing lack of due consideration for [the baker's] free exercise rights and the dilemma he faced." *Id*. Then, at the second hearing, another commissioner said "far more" disparaging things about Phillips's beliefs:

> "'I would also like to reiterate what we said in the hearing or the last meeting. Freedom of religion and religion has been used to justify all kinds of discrimination throughout history, whether it be slavery, whether it be the holocaust, whether it be—I mean, we—we can list hundreds of situations where freedom of religion has been used to justify discrimination. And to me it is one of the most despicable pieces of rhetoric that people can use to—to use their religion to hurt others.'"

*Id*.

The Court explained that the statement disparaged the baker's "religion in at least two distinct ways: by describing it as despicable, and also by characterizing it as merely rhetorical—something insubstantial and even insincere." *Id*. Noting that none of the other commissioners objected to those statements, and that the state appellate court neither mentioned nor expressed concern about their content, the Court could not "avoid the conclusion that these statements cast doubt on the fairness and impartiality of the Commission's adjudication of [the baker's] case." *Id*. at ___, 138 S Ct at 1729-30.

As for differential treatment, the Court noted that the commission on three prior occasions had "considered the refusal of bakers to create cakes with images that conveyed disapproval of same-sex marriage, along with religious text," and, on each occasion, determined that the bakers were justified in refusing service based on their views that the messages they were asked to convey were hateful and discriminatory. *Id*. at ___, 138 S Ct at 1730. In contrast, in Phillips's case, the commission ruled that he was not justified in refusing to provide the wedding cake, taking the opposite view: "that any message the requested cake would carry would be attributed to the customer, not to the baker." *Id*. Although Phillips pointed out that difference in treatment to the Colorado Court of Appeals, that court addressed

the differential treatment only "in passing," and accepted the rationale that the difference in treatment was warranted because the bakers in the prior cases had denied service based on the offensiveness of the message that they were being asked to convey, not based on impermissible discrimination. *Id*. at ___, 138 S Ct at 1730-31. That analysis was problematic as a constitutional matter because it was not viewpoint neutral: "The Colorado court's attempt to account for the difference in treatment elevates one view of what is offensive over another and itself sends a signal of official disapproval of Phillips's religious beliefs." *Id*. at ___, 138 S Ct at 1731.

Because of those features of the Colorado adjudication, the Court held that the commission's decision was the product of a hostility that "was inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion." *Id*. at ___, 138 S Ct at 1732. It emphasized "that the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Id*. at ___, 138 S Ct at 1731. The Court concluded by observing:

> "The outcome of cases like this in other circumstances must await further elaboration in the courts, all in the context of recognizing that these disputes must be resolved with tolerance, without undue disrespect to sincere religious beliefs, and without subjecting gay persons to indignities when they seek goods and services in an open market."

*Id*. at ___, 138 S Ct at 1732.

From the perspective of an intermediate appellate court called upon to apply the holding of *Masterpiece Cakeshop* on direct judicial review of an agency adjudication, it is difficult to discern, precisely, the rule of law announced or how to apply it. The Court did not identify an applicable standard of review, and its opinion poses different alternatives. Those range from a "slight suspicion" that the proceeding was not neutral to religious beliefs, to "elements of a clear and impermissible hostility" to religious beliefs, to

indications of "subtle departures from neutrality." *Id.* at ___, ___, 138 S Ct at 1729, 1731. The Court also did not identify what party bears the burden of persuasion on a claim that an adjudication was not neutral when the case is in a direct review posture.[7] It did not explain whether the question is primarily one of law or one of fact. To the extent the issue presents a factual question, the Court did not identify a standard of proof, or explain how factfinding accords with the usual role of an appellate court, a role that typically does not encompass factfinding. Must the government persuade the court that it acted in compliance with the neutrality requirement, or must the party claiming the lack of neutral treatment persuade the court of the non-neutral treatment? How convinced must a reviewing tribunal be of the presence or absence of non-neutrality to set aside or sustain an agency's decision?

Despite all these questions about how to conduct the review required under *Masterpiece Cakeshop*, we discern three principles to guide our review on remand. The first is that, in evaluating on direct review a litigant's claim that an adjudication is premised, in whole or in part, on unconstitutional hostility to religious beliefs, a reviewing court must examine the entire record of the case, including each stage of the case. The second is that, where, as here, a governmental adjudicator is called upon to determine whether a person's conduct violates a generally applicable, neutral law, and that conduct was motivated by a religious belief, the adjudicator must walk a tightwire, acting scrupulously to ensure that the adjudication targets *only* the unlawful conduct, and is not, in any way, the product of the adjudicator's hostility toward the belief itself. Third, and finally, because even "subtle departures" from neutrality violate the First Amendment, even "subtle departures" require some form of corrective action from a reviewing court. *Id.* at ___, 138 S Ct at 1731.

---

[7] In *Church of Lukumi Babalu Aye, Inc.*, the Court confronted a claim of non-neutrality in a different procedural posture. The plaintiffs in that case brought a civil rights action under 42 USC § 1983 to challenge the ordinance at issue, and they requested a number of remedies, including a declaration that the ordinance unlawfully targeted their religion, in violation of the Free Exercise Clause. *Church of Lukumi Babalu Aye, Inc.*, 508 US at 528-29. The trial court held a 9-day bench trial to develop the factual record related to the plaintiffs' claim that the ordinance was not religiously neutral. *Id.* at 528.

        When the whole record of this case is considered in light of those principles, and the specific aspects of the Colorado adjudication that the Supreme Court deemed problematic in *Masterpiece Cakeshop*, one portion of it evidences the type of subtle departure from neutrality that the Supreme Court identified in that case.[8] For reasons that we elaborate on, the prosecutor's closing argument apparently equating the Kleins' religious beliefs with "prejudice," together with the agency's reasoning for imposing damages in connection with Aaron's quotation of Leviticus, reflect that the agency acted in a way that passed judgment on the Kleins' religious beliefs, something that is impermissible under *Masterpiece Cakeshop*.

        First, the prosecutor's closing argument suggests that the Kleins' religious beliefs equate to "prejudice," in a way that resembles how one of the Colorado commissioners equated Phillips's religious beliefs to "rhetoric." The prosecutor discussed the history of the public accommodations law, and how it left Oregonians "'free to harbor whatever prejudices they choose'" but simply outlawed acts of discrimination in public accommodations. She then asserted:

> "*That's exactly what's going on in this case.* The Kleins, of course, are allowed to feel and hold whatever beliefs they hold dear to them. But when they operate in a public place and provide goods and services to the public, they have to do so without discrimination."

(Emphasis added.)

        One way to understand that line of argument is as identifying the Kleins' religious beliefs with the pejorative term "prejudice." In that way, the argument appears to pass judgment on the Kleins' beliefs, treating the beliefs as the equivalent of mere prejudice, and dismissing the dilemma of conscience faced by persons who believe that their faith demands one thing of them, while the law demands another. Although the BOLI prosecutor's statements were made in

---

[8] In their supplemental briefing, the Kleins discuss a range of things that, in their view, demonstrate that the proceeding was not religiously neutral. We address only those that, upon our whole record review, have convinced us that BOLI handled this matter in a way that deviated from the strict neutrality required under *Masterpiece Cakeshop*.

closing argument, and the BOLI commissioner, not the prosecutor, ultimately rendered the final order on review, the prosecutor was acting on behalf of BOLI in making those statements, and the commissioner did nothing to disavow them in the final order that he issued on behalf of the agency. *Cf. Masterpiece Cakeshop*, 584 US at ___, 138 S Ct at 1729-30 (observing that Colorado Court of Appeals did not mention troubling statements or express concern, and that briefs to the Supreme Court did not disavow or express concern about troubling statements).

In cases in which a prosecutor is independent from the ultimate adjudicator, we do not think there would be a basis to attribute the prosecutor's statements to the adjudicator. For example, if an executive-branch prosecutor made a disparaging statement about religion in a criminal case tried in a judicial-branch court, because of the independence of the branches, there likely would not be a basis to attribute the executive-branch actor's potential hostility to religion to the judicial-branch actor, even if the judicial-branch actor did not specifically disavow the executive-branch actor's statement. But under BOLI's statutory structure, BOLI's prosecutor is not independent of the final adjudicator, the commissioner. By statute, the commissioner is the head of BOLI. ORS 651.030(1) ("[BOLI] shall be under the control of the Commissioner of [BOLI] which office hereby is created."). By statute, the commissioner also is the one who has the authority to initiate the formal charges that start a case like this one. ORS 659A.845. By statute, even when the case is tried to the Office of Administrative Hearings initially, as it was here, the commissioner retains full control over the content of the order that results: "The commissioner may affirm, reverse, modify or supplement the determinations, conclusions or order of any special tribunal or hearing officer appointed under this subsection." ORS 659A.850(1)(a).

Because the BOLI prosecutor acts on behalf of BOLI, which is under the control of the commissioner, absent a disavowal by the commissioner of a prosecutor's position in the context of deciding a contested case, it is inferable that the prosecutor's position is the position of the agency, including its commissioner. Our initial decision in this case underscores that lack of independence. There, we implicitly

relied on the interdependence of BOLI and its prosecutor in rejecting the Kleins' substantial-reason argument when we pointed to the prosecutor's closing argument as indicative of BOLI's reasoning, although BOLI's order did not make the reasoning explicit. *Klein*, 289 Or App at 557-60. In so doing, we effectively recognized that the prosecutor represented the agency's viewpoint. In any event, given the agency's structure, that the prosecutor took that position, and the commissioner did not disavow it, gives rise to at least a "slight suspicion" that the position is one shared by the agency, including its head and final adjudicator, the commissioner.

Similarly to what happened in *Masterpiece Cakeshop*, that specter of non-neutrality materializes into the affirmative conclusion that BOLI at least subtly departed from principles of neutrality when it awarded noneconomic damages based on Aaron's quotation of Leviticus. BOLI found as fact that Aaron quoted Leviticus during a discussion with Cheryl about their differing religious perspectives on marriage by couples of the same sex. It also found as fact that Aaron's testimony about what he said in that discussion, and his intention in saying it, was credible. Cheryl had returned to the store in the hopes of a "teaching moment" to share with Aaron how she used to share his beliefs but, as a result of her experience, no longer believes the same things. It was in response to Cheryl's sharing of her perspective that Aaron asked why the Bible states what it does, and he quoted Leviticus. Aaron testified that he did not call Cheryl's children abominations or make the statement with the intention of doing so, testimony that BOLI credited over Cheryl's competing version of events. Cheryl nonetheless told Rachel and Laurel that Aaron had said that her children were abominations, and BOLI sought and imposed noneconomic damages based on the distress that Rachel and Laurel suffered upon hearing Cheryl's characterization of what Aaron had said. As we recognized the first time this matter was before us, in so doing, BOLI adopted the perspective of its prosecutor that it did not really matter what Aaron actually had said, because of the distress caused by Aaron's use of the word "abomination," and because Aaron had made those statements in the course of denying services.

BOLI's determination that it did not matter whether Aaron had, in fact, called Cheryl's children abominations or, instead, quoted Leviticus in response to Cheryl's explanation of her change in perspective, could be understood to indicate the same kind of dismissiveness the Supreme Court found impermissible. Taking the position that it did not matter factually what Aaron had said tends to suggest hostility or dismissiveness because it is not typical to hold someone liable in damages for something they did not, in fact, say or do. On the contrary, the facts matter when imposing liability for damages, and there is a significant difference, factually, between a person who quotes a topically relevant Bible passage that contains an inflammatory word to respond to a suggestion that they might change their beliefs, and a person who calls another person a name using that same inflammatory word. Although that hostility could be a general hostility toward Aaron based on the harm his words caused, rather than hostility toward his religious beliefs, the prosecutor's prior apparent equation of Aaron's religious beliefs with prejudice, points at least somewhat in the direction of the latter. Additionally, BOLI never distinguished or explained why it was equating Aaron's identification of a portion of the Bible that informs his religious beliefs—in the context of a discussion explicitly about religious beliefs—with calling the other person's children a horrible name. Instead, BOLI rested its decision on the fact that in his conversation with Cheryl, Aaron uttered the inflammatory word "abomination." Similar to what happened in *Masterpiece Cakeshop*, BOLI appears to have treated Aaron's expression of his beliefs as something closer to "rhetoric" than an attempt to explain the source for his beliefs, even though it credited Aaron's version of the exchange with Cheryl.

Ultimately, what indicates that BOLI at least subtly departed from the requirement of strict neutrality in its damages award is the fact that it expressly awarded damages in part based on what it found as fact to be Aaron's expression of his views in the context of a religious dialogue. The conversation that Cheryl and Aaron had when she returned to the store is a conversation that is dividing faith communities. *See, e.g.*, Campbell Robertson & Elizabeth

Dias, *United Methodist Church Announces Plan to Split Over Same-Sex Marriage*, NY Times (Jan 3, 2020), https://www.nytimes.com/2020/01/03/us/methodist-split-gay-marriage.html (accessed Jan 18, 2022) (reporting that leaders of the United Methodist Church, "the second-largest Protestant denomination in the United States," had announced "a plan that would formally split the church, citing 'fundamental differences' over same-sex marriage after years of division"). According to BOLI's findings and the evidence in the record consistent with those findings, Cheryl and Aaron were talking about their respective religious beliefs when Aaron, in response to Cheryl's explanation about why her religious perspective had changed, asked why the Bible says what it does in Leviticus. Given that circumstance, to the extent that it both pleaded (as prosecutor), then proved to itself and ordered the Kleins to pay monetary damages based on Aaron's statements in that conversation, BOLI effectively took a side in an ongoing religious discussion. That does not square with the obligation of government to remain strictly neutral toward religion and strictly neutral toward particular religious beliefs. Rather, given BOLI's overarching and multifaceted role in this case, it directly suggests a governmental preference for one faith perspective over another in what remains an ongoing, emotionally hard discussion within American communities of faith.

In reaching this conclusion, we do not mean to suggest that the use of a Bible quote immunizes a speaker from liability for emotional distress damages. It is easy to envision circumstances in which, as a factual matter, a speaker might employ biblical references to engage in name-calling and inflict emotional distress. We also do not mean to suggest that Aaron's statement, as recounted to them, did not cause the Bowman-Cryers the severe emotional distress that BOLI found it caused them. The record amply supports the finding that Aaron's statement, as communicated to them by Cheryl, made the Bowman-Cryers feel alienated from their faith, causing them significant emotional distress. But, in this instance, according to BOLI's factual findings, in the context of a conversation about religious beliefs, Aaron did not say what Cheryl reported him saying, and did not intend to communicate to that effect when he quoted Leviticus to

her. Yet BOLI awarded damages based on the use of the term "abomination" without engaging with, or even recognizing, Aaron's right to express his own belief within the specific context of a conversation that Cheryl, having experienced her own change in religious perspective, initiated with the hope that Aaron could learn from her experience and see that a change in religious perspective is possible.

In view of the foregoing, we conclude that, under *Masterpiece Cakeshop*, the damages portion of the proceedings before BOLI did not comport with the First Amendment's requirement of strict neutrality toward religion. The remaining question is disposition.

As for the issue of liability—our conclusion that BOLI properly determined that Aaron violated ORS 659A.403 by refusing service to the Bowman-Cryers and that neither the state nor federal constitution prohibits the application of that neutral, generally applicable law to his conduct of denying cake-making services based on sexual orientation—we adhere to our prior decision in its entirety. We do so for two reasons.

First, the liability issues were resolved on summary determination before the agency on undisputed facts. As a result, any non-neutrality on the part of the agency did not affect a factfinding process.

Second, as for the law, our court reviewed all the legal questions concerning liability for legal error. Applying the operative standard of review under the APA, we did so without deference to BOLI on those questions of law, and we do not understand the Kleins to contend that we conducted that nondeferential review in a non-neutral way. In that regard, by noting in *Masterpiece Cakeshop* that the Colorado Court of Appeals failed to address the statements by the members of the Colorado Civil Rights Commission that the Court found concerning, the Court implicitly indicated that, at times, appellate-level review can ensure that a proceeding is neutral in the face of potential non-neutrality by an agency adjudicator. *See Masterpiece Cakeshop*, 584 US at ___, 138 S Ct at 1729-30 ("And the later state-court ruling reviewing the Commission's decision did not mention those comments, much less express concern with their content.").

We recognize that when this case was first before us, we, like the Colorado Court of Appeals, did not address the aspects of the agency adjudication that we have determined to be non-neutral on remand. That is because the significance of those aspects of the adjudication to the Kleins' free exercise claim was not readily apparent until the Supreme Court's decision in *Masterpiece Cakeshop* provided a lens to see that significance. Although throughout this entire case the Kleins have challenged BOLI's award of damages based on Aaron's quotation of Leviticus, and also have argued that BOLI's order reflected unconstitutional targeting of religion, it was not until their supplemental briefing on remand that they first linked the two arguments and pointed to the damages award as indicative of that targeting. Along the same lines, as noted, *Masterpiece Cakeshop* appears to represent an expansion of *Church of Lukumi Babalu Aye, Inc.*, advancing the analysis in that case, which involved a claim of non-neutrality that was adjudicated on its facts in a trial court, to the context of direct appellate review of agency adjudications. As a result, it would not have been readily apparent to the parties when they briefed this case initially to frame their arguments in that way, or to us that we should conduct that type of religious-neutrality review the first time we saw this case. In other words, we do not view the failure to anticipate the approach taken by *Masterpiece Cakeshop*, and to conduct the review that case now appears to require, as indicative of non-neutrality.

We reverse and remand the order's damages award. For the reasons identified above, the damages portion of the case had the same or similar hallmarks of non-neutrality that caused the Supreme Court to set aside the Colorado order at issue in *Masterpiece Cakeshop*, and we read that case to require us to take appropriate corrective action to address that non-neutrality. In contrast with the liability portion of the case, which turns on questions of law, any non-neutrality in the damages portion of the decision is not something we can remedy through appellate review. The appropriate amount of damages is something highly fact-intensive and we are not, in this instance, empowered to engage in factfinding ourselves. On remand, BOLI should conduct any further proceedings on the remedy for Aaron's

violation of ORS 659A.403 in a manner consistent with *Masterpiece Cakeshop* and this decision. In that regard, we take note that BOLI now has a different commissioner, so there is no reason to think that any hostility toward the Kleins' religious beliefs reflected in the prior decision will affect the remedy case on remand.

Reversed as to BOLI's conclusion that the Kleins violated ORS 659A.409 and the related grant of injunctive relief; reversed and remanded as to damages; otherwise affirmed.